**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert A. ALEXANDER,
Defendant–Appellant.**

**No. 87–1912.**

United States Court of Appeals,
Tenth Circuit.

June 14, 1988.

Marilyn Modin Wagner (B. Hayden Crawford with her, on the brief) of Crawford, Crowe & Bainbridge, P.A., Tulsa, Okl., for defendant-appellant.

Kenneth P. Snoke, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with him, on the brief), Tulsa, Okl., for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, and BARRETT, Senior Circuit Judge, and DUMBAULD *, District Judge.

BARRETT, Senior Circuit Judge.

Robert Alexander (Alexander) appeals his jury convictions of two counts of mail fraud and five counts of wire fraud under 18 U.S.C. §§ 1341 and 1343.

During the summer of 1981, Alexander, as president and chief executive officer of Universal Energy Corporation (UEC), entered into an agreement with Petroleum Pipe, S.A. (PPSA) for the purchase of $2,700,000 of variously sized pipe. PPSA was a pipe selling brokerage company with offices in Zurich, London and Singapore. Under their agreement, PPSA would direct sell pipe to UEC and would provide copies of bills of lading, invoices and mill certificates on all pipe shipped to UEC. Thereafter, UEC would resell the pipe and PPSA and UEC would equally share the profits and losses.

By the end of 1981, PPSA had delivered $2,700,000 worth of pipe to the United States and Alexander had paid $1,500,000 to PPSA. During subsequent discussions between PPSA and Alexander relative to UEC's unpaid balance of $1,200,000, Alexander cited financial problems, pitted pipe, and the lack of mill certificates as the reasons for his non-payment.

Settlement negotiations on the unpaid balance subsequently ensued between UEC and PPSA in late December, 1981. These negotiations culminated on January 15, 1982 when the parties entered into a written agency agreement whereby, (a) UEC was to be paid a $95,984.59 commission from PPSA for representing PPSA in some pipe sales to Atlantic Richfield Corporation's (ARCO) Indonesian subsidiary in Singapore, (b) UEC would represent PPSA as its agent in bidding on pipe and billing ARCO for delivery of pipe by PPSA directly to ARCO's Singapore operations, (c) PPSA would repurchase some of the pipe sold to UEC to fulfill the first pipe delivery to ARCO in Singapore, and (d) Alexander would remit to PPSA $435,124.18. Thereafter, UEC remitted the $435,124.18 due PPSA under this agreement.

During this period, PPSA shipped ARCO its first pipe order and notified UEC of the shipment. UEC immediately billed ARCO. ARCO subsequently remitted $344,699.80, the full amount due, to UEC. Thereafter, although the UEC/PPSA agency agreement required that ARCO's payments be transferred directly to PPSA's Swiss bank account, Alexander deposited the ARCO check into UEC's account. Alexander then used the proceeds of the ARCO check for UEC's operations.

Shortly thereafter, PPSA delivered the first of three shipments of 50,000 feet of 9⅝" pipe to ARCO. PPSA notified UEC of the shipments and, as before, UEC billed ARCO for the pipe. ARCO thereafter remitted $1,108,994.34, the full amount due, directly to UEC. These funds were deposited to UEC's account and used to pay off

* The Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

existing bank loans and for operating capital.

During this time, ARCO was unaware that under the UEC/PPSA agency agreement, UEC was required to insure that ARCO's payments were wired directly to PPSA's Swiss bank account.

After PPSA's second pipe shipment to ARCO, and UEC's failure to remit to PPSA, PPSA officials informed Alexander that no further deliveries would be made under ARCO's purchase orders until such time as arrangements were made by Alexander to pay for the first two shipments. It is apparently uncontested that as of March, 1982, UEC had received, retained and applied to its own use approximately $1,500,000 from ARCO. These were funds which, under the UEC/PPSA agency agreement, UEC had agreed to wire transfer directly to PPSA's account.

PPSA officials subsequently met with Alexander on May 10, 1982. During this meeting, an agreement was reached whereby Alexander agreed to pay PPSA $1,340,525.48 as full and final settlement of both his ARCO agency agreement and his earlier direct purchase agreement with PPSA. Alexander failed to pay PPSA in accordance with this agreement. Rather, Alexander advised PPSA that there had been some delays and that the funds due PPSA would be sent later.

PPSA subsequently notified Alexander that it would file legal action to collect the $1,340,525.48 due and owing. In response, Alexander sent PPSA a series of checks for the monies due PPSA. None of the checks were honored for payment. During this time frame, UEC also sent ARCO a bill for the second shipment of 9⅝″ pipe. Thereafter, although PPSA had not formally delivered the pipe, ARCO, by inadvertence, sent UEC a check for $1,090,919.96 in payment for the pipe. Upon receipt of the check, Alexander deposited it into a seldom used UEC account and thereafter withdrew the funds for his personal use. By this time, Alexander had obtained and utilized in excess of $2,500,000 paid by ARCO for pipe sold and delivered by PPSA.

In October, 1984, PPSA filed a civil suit against UEC for $2,500,000 plus interest. That suit was subsequently settled for $1,050,000 which Alexander paid to PPSA in 1985.

On October, 8, 1986, Alexander was charged in a seven-count indictment with mail and wire fraud. The indictment charged Alexander with a scheme to defraud PPSA and to obtain money or property by false and fraudulent pretenses. Prior to trial, Alexander sought to exclude evidence that he had attempted to obtain money from one Robert Sutton and from people in Arkansas whom he later discovered might have been drug dealers. The court reserved ruling on Alexander's motion.

Alexander's trial commenced on February 26, 1987, and continued through April 7, 1987. Shortly after the trial had commenced, a superseding indictment was returned against Alexander in an unrelated case before a different judge. At the government's request, the indictment was sealed and not disclosed to anyone except court personnel, Alexander and his attorneys. Alexander's motions for a dismissal and for a continuance in his pending trial were both denied by the district court.

During the trial, Alexander defended on the basis that he had retained the monies received from ARCO in good faith, based on legitimate and reasonable concerns about his contracts with PPSA. Alexander contended that he retained the monies with no intent to defraud. The court denied Alexander's repeated attempts to introduce evidence of the settlement of the civil suit brought by PPSA.

Alexander was convicted on all seven counts. His post-trial motions for judgments of acquittal and a new trial were denied.

On appeal, Alexander contends the district court erred in: (1) denying his motions for mistrial, new trial, and judgment of acquittal on the grounds of prosecutorial misconduct; and (2) improperly excluding evidence that the money he had retained was a legitimate offset against money owed to him.

## I.

Alexander contends that the trial court erred in denying his motions for mistrial, new trial and for judgment of acquittal on the grounds of prosecutorial misconduct.

Alexander argues that prosecutorial misconduct arose from: the prosecutor's verbal utterances, laughter, and physical gestures designed to ridicule him in the presence of the jury; the return of a superseding indictment against Alexander in a companion case during the jury trial in the instant case; and the prosecutor's cross-examination of him relative to his borrowing money from one Robert Sutton and his attempts to borrow money from people in Arkansas whom Alexander described as "people who handled drugs." (R., Vol. XXIV at p. 3151.)

■ Prosecutorial misconduct is not *per se* reversible error. *United States v. Taylor,* 800 F.2d 1012, 1018 (10th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). We follow the general rule that not all misconduct requires reversal; rather, it is only when such conduct can be said to have influenced the verdict that it becomes prejudicial. *Id.*

In *United States v. Martinez–Nava,* 838 F.2d 411, 416 (10th Cir.1988), we observed:

In analyzing claims of prosecutorial misconduct, we must perform a two-step analysis. We must first examine whether the prosecutor's conduct was in fact improper, and if so, then determine whether such conduct requires reversal, or whether it was harmless beyond a reasonable doubt. *United States v. Hasting,* 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). "It is only when such conduct can present a question whether there is reason to believe that it influenced the jury's verdict that the failure to take appropriate steps to remove it will warrant a reversal." *Marks v. United States,* 260 F.2d 377, 383 (10th Cir.1958), *cert. denied* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959)....

In determining whether the prosecutorial misconduct complained of was harmless, we are guided by *United States v. Hastings,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983):

After examining the harmless-error rules of the 50 States along with the federal analog, 28 U.S.C. § 2111, the *Chapman [v. State of Cal.]* Court stated:

All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. *We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless,* not requiring the automatic reversal of the conviction." 386 U.S. [18], at 22 [87 S.Ct. 824, 827, 17 L.Ed.2d 705] (emphasis added).

In holding that the harmless-error rule governs even constitutional violations under some circumstances, the Court recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial....

Since *Chapman,* the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations.... The goal, as Chief Justice Traynor has noted, is "to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error." Traynor, *supra,* at 81 (footnote omitted).

Mindful of these standards, we now consider Alexander's three allegations of prosecutorial misconduct.

### a.

■ Alexander contends that throughout the trial, the prosecutor engaged in verbal utterances, laughter and physical gestures designed to ridicule him in the presence of

the jury. Alexander contends that the prosecutor's inappropriate conduct continued even after admonishments by the court.

The government responds that the first objection to the chuckling and facial gestures of the prosecutor occurred during the latter part of the trial and that the court's admonition was directed to all the attorneys.

Alexander's trial commenced on February 26, 1987. On April 2, 1987, five days before the completion of the trial, the district court remarked as follows during an in-chambers conference:

THE COURT. Yes, you may make it as a part of your record; although, you didn't say that I had already commented to Mr. Snoke [the prosecutor] about the one incident last—yesterday. As I have previously told all of you, you're all doing the same thing, only in different ways. Mr. Williams [one of the defense attorneys], when he gets an answer he doesn't like, he takes two steps backwards and looks up at the ceiling, conveying something. And you're all going to have to be very careful not to convey whatever your personal emotions may be. And Mr. Snoke, yes, I want you to be very careful also, because I think you are all—I don't think any of you are attempting to do it, but it's a habit that people get into at times when you're emotionally involved in a case, in which you are reacting to what somebody has said. And the attorneys' reactions should not be made a part of the trial. It's what the jury hears from the witness and the witness's actions and reactions that they must evaluate. And you did it again after I said that, and I want you to be very careful.

I want to also say that I'm satisfied that none of you have done anything that would affect the outcome of the trial; but, nonetheless, it is a thing, and I think Mr. Williams is correct, he should have called it—he can make his record on it. . . .

(R., Vol. XXIV at p. 3134).

In view of the district court's determination that the prosecutor and Alexander's

counsel were each reacting to the trial testimony, coupled with the district court's finding that "none of you have done anything that would affect the outcome of the trial," we hold that the actions of the prosecutor did not amount to prosecutorial misconduct. The district court, having observed the entire trial, was able to determine first hand whether there was "reason to believe ... [that the prosecutor's actions] ... influenced the jury's verdict." *United States v. Martinez-Nava, supra.* We shall not set aside the trial court's determination that counsel did not do anything that would affect the outcome of the trial.

b.

■ Alexander contends that the prosecutor caused the return of a superseding indictment in a companion case during his trial herein and that the superseding indictment "may have been designed to chill the exercise of Alexander's right and ability to defend himself." (Appellant's Brief at p. 5).

In response, the government argues that Alexander has failed to establish how he was prejudiced by the return of the superseding indictment and that the district court correctly found that the ministerial act of returning a superseding indictment in an unrelated pending case before a different judge did not warrant dismissal in this case. We agree. The superseding indictment did not amount to prosecutorial misconduct mandating reversal.

It is uncontested that the superseding indictment was dismissed two weeks after Alexander's trial. The district court reviewed the superseding indictment and found that the "charges didn't have anything to do with what we've got here, as far as I could tell on the face of it." (R., Vol. VIII, p. 581). Alexander has failed to establish how he was prejudiced in any manner by the superseding indictment. Furthermore, our own review of the record has failed to disclose any prejudice. Error, if present at all, in the return of the su-

perseding indictment in a different case before a different judge was, under the circumstances, "so unimportant and insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless." *United States v. Hastings, supra.*

### c.

■ Alexander contends that the prosecutor's cross-examination of him about borrowing money from one Robert Sutton and his attempts to borrow money from people in Arkansas whom he described as "people who handled drugs" amounted to prosecutorial misconduct mandating reversal.

Prior to trial, the government provided Alexander with fifteen cassette tapes containing over 100 telephone conversations, together with transcripts of same. These telephone conversations were between Alexander and government witness Ronald Kelsey who had taped the calls. The majority of the taped conversations centered around Alexander's and Kelsey's individual financial problems and the manner in which they were attempting to solve them.

During several of their conversations, Alexander discussed borrowing money from Robert Sutton[1] and how Gary Glanz, Kelsey's cousin and Sutton's bodyguard, could assist Alexander in borrowing funds from Sutton. Alexander also discussed a trip to Arkansas to borrow some money from people whom Alexander described as "people involved in handling drugs."[2]

Prior to trial, the government announced that it intended to cross-examine Alexander relative to his hopes to borrow money from Sutton and others. This was to be done, according to the government, to establish Alexander's desperate need for money at the time and to counter Alexander's defense that he was a man of considerable financial means who could pay his bills and who did not need to defraud anybody, including PPSA.

After Alexander objected to the government's suggested line of cross-examination, the following colloquy transpired between the court and defense counsel:

THE COURT: Then why don't you enter into a stipulation with him [the prosecutor], that he [Mr. Alexander] did go to Louisiana, that he did meet with a person of substantial means, and he did seek to borrow money. That way Sutton's name will never be mentioned.

\* \* \* \* \* \*

THE COURT: Will you enter into a stipulation?

MR. WILLIAMS: May I confer with counsel for just a moment?

THE COURT: Sure. What I'm saying —all I'm saying is if we can enter into—

MR. WILLIAMS: I think we could probably—and I don't mean to hedge with you, Judge, because I know you want to make a ruling or have a statement definitive. I would want to check with my client before I made a stipulation but I would anticipate—.

THE COURT: Okay. You'll either stipulate or you're overruled. And if you come in with a stipulation that is reasonable, and if you find out there is some other factor in here, let me know. Okay?

\* \* \* \* \* \*

THE COURT: So I'll, in effect, reserve the ruling on this, but I'm telling you to stipulate unless there is some real reason not to do so.

(R., Vol. III at pp. 28–30).

There is no evidence of a subsequent stipulation by counsel for Alexander or any reference thereto in the record.

---

1. Sutton was a substantial Tulsan who, shortly after donating $945,000 to Tulsa County for a new Texas League baseball stadium, was indicted and convicted of various counts of conspiracy to obstruct justice, mail fraud, wire fraud, racketeering and obstruction of justice. Sutton's convictions were affirmed on appeal. *United States v. Sutton,* 732 F.2d 1483 (10th Cir.1984).

2. Although we do not have the tapes or transcripts before us, Alexander was apparently unaware, prior to his visit to Arkansas, that the people he was meeting with for the purpose of borrowing money, were involved in drugs.

During the trial, Alexander testified in detail about his substantial net worth. He presented financial statements which indicated that he had a net worth of over eleven million dollars on a cost basis and over twenty-three million dollars on a market basis in February, 1982. Alexander introduced similar statements for 1983. They indicated that Alexander had a cost basis net worth of over twelve million dollars and market value net worth of over fifteen million in February, 1983.

In the government's cross-examination of Alexander relative to his conversations with Kelsey and his [Alexander's] attempts to borrow money, the following colloquy transpired:

Q. All right. Now with respect to Mr. Kelsey, did you have conversations, sir with Mr. Kelsey on a frequent basis, starting in above June of 1982, as he indicated, in which you asked him to find people to loan you money?

A. That—I'm sure I had many conversation with him about borrowing or investor money, it started—

Q. Although you weren't aware at the time, you're aware now, sir, that a number of those conversations were taped, is that correct?

A. That's correct, I found out.

Q. All right.... Did you enlist Mr. Kelsey's assistance and that of a relative of his named Gary Glands [sic] in obtaining a loan from Mr. Robert Sutton?

A. Yes, they talked to him and they offered it.

MR. SEYMOUR: If the Court please, may we approach the bench?

THE COURT: Not right now.

*　*　*　*　*　*

Q. All right. You made a personal loan with Mr. Sutton, for how much?

A. There were two different amounts; 400,000 and 1,600,000.

Q. All right.

*　*　*　*　*　*

Q. I will ask the question again. You chose to do it then through Mr. Sutton rather than to go to a bank or normal sources?

A. Well, I think we did both at the same time.

Q. Which means that you borrowed—in addition to money you borrowed from Mr. Sutton, you borrowed other monies from banks at that time?

A. That is true.

*　*　*　*　*　*

Q. You went to some other sources beyond that, didn't you, sir?

A. We did a convertible debenture.

Q. I'm talking about you went to some sources in Arkansas in an attempt to borrow money in the latter part of 1982, which sources you described as being people who handled drugs.

THE COURT: Just a second.

A. That is not true.

MR. SEYMOUR: Yes, sir, may we approach the bench, please?

THE COURT: Certainly. Sure, sure.

(R., Vol. XXIV at pp. 3147–48 and pp. 3150–51).

During the ensuing bench conference, Alexander moved for a mistrial. In denying Alexander's motion, the court found:

THE COURT: Well, let me make some comments. First, Mr. Snoke is correct when he observes, and you have not questioned this, that the direct testimony clearly placed in the evidence the financial condition of both Mr. Alexander and his company, Universal. The government has obviously been arguing through the evidence that has been presented a need for Mr. Alexander to utilize the monies that were the product of the pipe transactions in—for purposes other than what we have now heard Mr. Alexander to say that he used them for, or why he kept them, and that is an issue of fact. And that the government, in its cross examination and any other submittals, very properly can offer evidence and cross examine on that issue, provided, of course, it's done in a correct and proper way.

As to the reference to Sutton, I don't view that as any substantial problem. I will be happy to—I would be happy, as far as the Sutton situation, to give any

limiting instruction if you wish it. My experience around here is, about the only people who are interested in or have knowledge of Mr. Sutton are people in the oil field business who did business with he and his companies and a lot of lawyers around here that read the papers real quick and careful.... Everbody [sic] thought we were going to have to use hundreds of jurors to find people that didn't know Sutton, and we found that practically nobody knew him that was selected through the jury selection process, and I believe in the whole—very few number, at least, that I was informed even knew him, and I think they went through—

\*　　\*　　\*　　\*　　\*　　\*

I am very much concerned, though, about the inquiry on the Arkansas situation. I would have no problems about questions, did you go to Arkansas, did you seek money in Arkansas, did you seek money from nonbankers, did you try to get a nonconventional type of— source of money, and words of that nondescriptive sense.... But Mr. Snoke went on and said, "Which source you described as people who handled drugs." Now, immediately following that question the Court said, "Wait just a minute." And then Mr. Alexander said, "That's not true." So the state of the record at this point is a complete and unqualified denial of that situation....

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Now, the Court has several options. One, to declare a mistrial. I'm satisfied that there isn't any purposeful intent to inject a matter that the government shouldn't have done. The question the Court has got before it is whether it having been done, whether it has so tainted the trial itself that the Court shouldn't sustain the motion for summary—for directed verdict.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: And it's my belief at this time that we can go forward with this trial, but I would do so only under the directions to counsel for the government that no further reference whatsoever in any sort be made to the Arkansas trip.

MR. WILLIAMS: Do you propose to make any admonition—

THE COURT: I will do so if you want me to.

MR. WILLIAMS: I to confer on this with Mr. Seymour—

THE COURT: But I think you ought to think about it.

(R., Vol. XXIV, pp. 3161–66).

We hold that the district court did not err in denying Alexander's motions for mistrial.

Alexander placed his financial integrity squarely before the jury and he was fully aware that he would be subjected to vigorous cross-examination on this same critical evidence involving his good faith and criminal intent. In *United States v. Havens*, 446 U.S. 620, 626–627, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the Court held:

We have repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences. This is true even though a defendant is compelled to testify against his will.... It is essential, therefore, to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.... In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination. *Without this opportunity, the normal function of cross-examination would be severely impeded* (emphasis added).

We are disinclined to overrule the district court's determination that the brief references to Sutton and to "sources you described as being people who handled drugs" did not warrant a mistrial. These

comments arose during a few brief minutes in a trial that extended over five and a half weeks. Alexander was not entitled to "an error free, perfect trial." *United States v. Hastings, supra.* Moreover, the court offered, and the defense apparently did not avail itself of, a cautionary instruction. We do not believe that the challenged cross-examination influenced the jury's verdict or had any "likelihood of changing the result of the trial." *Id.* Thus, error, if present, was harmless.

## II.

■ Alexander contends that the district court erred in excluding evidence of his 1984 settlement with PPSA. As set forth, *supra*, PPSA sued UEC in 1984 for $2,500,000 to recover the monies which ARCO had paid to UEC and which UEC had, contrary to its agency agreement with PPSA, failed to remit to PPSA. The suit was settled in December, 1984, for $1,050,000, which Alexander paid in 1985.

Alexander argues that evidence of the settlement was crucial to his defense because he had retained the ARCO payments in good faith as an offset and as leverage to motivate PPSA to perform in correcting its breaches on the UEC/PPSA pipe contract.

The government responds that the district court properly exercised its discretion in excluding evidence of the settlement agreement because the court allowed Alexander to introduce evidence of alleged PPSA breaches under the ARCO and UEC/PPSA contracts and to testify fully about his theory in retaining and spending the ARCO payments. Thus, the 1984 settlement was irrelevant as to Alexander's intent or state of mind during 1982 when he received and used the ARCO money and failed to remit same to PPSA.

This court has long recognized that good faith is a complete defense to a mail fraud charge. *See United States v. Cronic,* 839 F.2d 1401 (10th Cir.1988); *United States v. Washita Construction Co.,* 789 F.2d 809 (10th Cir.1986); *United States v. Westbo,* 576 F.2d 285 (10th Cir.1978); *Sparrow v. United States,* 402 F.2d 826 (10th Cir.1968).

The district court is granted broad discretion in ruling on the relevancy of evidence. *United States v. Neal,* 718 F.2d 1505 (10th Cir.1983), *cert. denied,* 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 34 (1984). Whereas all relevant evidence is considered admissible, unless otherwise properly excluded, evidence which is not relevant is not admissible. Fed.Rules Evid.Rule 402, 28 U.S.C.A. In reviewing the evidentiary rulings of a trial court, we may not reverse in the absence of an abuse of discretion. *United States v. Rodriguez–Panto,* 841 F.2d 1014, 1018 (10th Cir.1988) *quoting, United States v. Cooper,* 733 F.2d 1360, 1366 (10th Cir.), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984).

Applying these standards to the facts herein, we hold that the district court did not err in refusing to allow Alexander to introduce evidence of the 1984 settlement. The district court correctly found that, in view of the many different reasons prompting settlements, the 1984 settlement could not be considered relevant to Alexander's good faith intent during the 1982 time period when he retained and utilized monies paid by ARCO to UEC.

The indictment charged that the scheme to defraud pursued by Alexander commenced on or about March 10, 1982, and continued through until on or about November 1, 1982. As part of the scheme—all within the above charging period—the indictment charged that Alexander, pursuant to the agreement between UEC and PPSA, received money from ARCO which was not transferred to the account of PPSA in accord with the agreement, but instead converted and utilized for Alexander's own purposes. That was the crux of the fraud. Proof of criminal intent to defraud necessarily had to attach to the circumstances existing during the period charged. It is for that reason, among others, that the district court refused to permit Alexander to introduce evidence of the settlement which occurred in December, 1984. Nothing about the 1984 settlement could retroactively demonstrate Alexander's state of mind and intent in 1982. There is no legitimate dispute but that

$2,500,000 was owing by Alexander–UEC to PPSA in 1982. Thus, at best, the settlement would only seem to establish that Alexander defrauded PPSA out of $1,050,-000 rather than $2,500,000.

Alexander relies on *McNally v. United States*, 483 U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) for the proposition that the settlement should have been admitted in evidence on the premise that because of the settlement PPSA suffered no tangible loss. This interpretation of *McNally* is faulty. *McNally* stands for the rule that there can be no prosecution for mail fraud under 18 U.S.C. § 1341 unless there has been a *tangible* loss of money or property to the victim, as distinguished from an *intangible* loss such as a betrayal of trust owing to the victim. Unlike *McNally*, there was a substantial tangible loss of money in this case, when, in 1982, Alexander and UEC received and misapplied money received from ARCO which should have been remitted to PPSA. Furthermore, nothing in *McNally* is directed to the issue of intent.

Alexander also urges that *United States v. Foshee*, 569 F.2d 401 (5th Cir.1978), *modified*, 578 F.2d 629 (5th Cir.1978), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1036, 62 L.Ed.2d 766 (1980) supports his contention that the trial court erred in not admitting evidence of the 1984 settlement because evidence of his subsequent payment would be relevant to Alexander's intent (Brief of Appellant, p. 26). We disagree. *Foshee* involved a check kiting crime. It was there held that evidence of payment of the checks within a period of one week of the discovery of the check kiting was admissible on the issuer's intent to defraud. There is a big difference between admitting in evidence *full* repayment of the bad checks within one week of their discovery as in *Foshee* and the settlement of a lawsuit involving claims of $2,500,000 for $1,050,000 more than two years after the money had been withheld and misapplied. The latter scenario, unlike that in *Foshee*, can hardly be said to demonstrate a lack of intent on the part of Alexander to defraud PPSA.

In *United States v. Southers*, 583 F.2d 1302, 1308, n. 8, (5th Cir.1978), the court confined its *Foshee* opinion to its specific facts in upholding the trial court's refusal to instruct the jury that they should consider restitution made by the defendant in relation to his good faith in a bank fraud case:

> The holding of *Foshee* is limited to cases involving schemes of the nature of check kiting and cannot rationally be extended to the situation where the initial manipulation of the bank's funds was unauthorized.

Alexander offered the 1984 settlement solely to prove that his "good faith" intent in 1982 in withholding the $2,500,000 from PPSA was to, in effect, protect himself as an "offset" to losses or anticipated losses he suffered in his dealings with PPSA. The government's case was, on the other hand, that Alexander unlawfully withheld and misapplied the $2,500,000 from PPSA *in 1982* because of Alexander's financial needs. Those critical issues were firmly joined, evidenced by the opening statement of counsel for Alexander when he argued that Alexander's combined financial resources were such that Alexander did not have to "lie, cheat, steal or defraud anybody, because he could pay his bills." (R., Vol. II, pp. 97–98). Alexander's defense throughout trial was that he was fully solvent in 1982 (and thereafter) and could have paid off the $2,500,000 he had retained and kept from PPSA but that he rightfully withheld this money from PPSA as an "offset" against existing, potential losses and anticipated future losses from a New Orleans contract, coupled with the possibility that UEC would be accountable to ARCO for non-performance by PPSA in future contracts.

The trial court permitted Alexander to put this evidence before the jury. The defense was accorded great leeway. The court did not permit introduction of the 1984 settlement, however, on the clearly expressed basis that civil suits are settled for a number of reasons and often for far less than is believed to be owing due to a variety of reasons, having no relation to

potential offsets. The district court properly found that the settlement agreement did not support the *purpose* for which Alexander was offering it and that the potential for jury confusion outweighed the settlement's evidentiary value. We agree.

After the court had denied Alexander's request to introduce evidence of the settlement,[3] the following colloquy occurred between defense counsel and the district court:

MR. WILLIAMS: Your Honor, if I could just inject this, maybe I mentioned this yesterday. I really concerns me that the government has been allowed to present this witness with the assertion that Alexander/Universal was indebted to PPSA and these folks for $2.5 million, and that a civil suit was filed. *And I can fully appreciate—you finally got through my thick skull the wisdom of your ruling with regard to the settlement, and I don't have any quarrel with that at all.* But I would ask you to consider the feasibility of a cautionary instruction that inasmuch as this matter has been broached with the jury that there was a civil suit, to the effect that, your instruction, that any civil litigation that might have been filed is of no moment in this case—(emphasis added).

THE COURT: I have no problem with that at all. And as a matter of fact, I was going to suggest to you gentlemen that you prepare a suggested instruction to the effect that while there has been some mention of testimony given in another action, they are to disregard the fact that another action was given, that it has no bearing whatsoever, they are to draw no conclusions from it, nor any inferences from it. I have no problems with that at all.

(R., Vol. X at pp. 940–41).

Thereafter, defense counsel proffered a cautionary instruction which was accepted by the parties and given by the court:

MR. SEYMOUR: Shall we do the cautionary instruction?

THE COURT: Go ahead. We'll try. Let's see what you've got.

MR. SEYMOUR: I have written it out, and I've shown it to Mr. Snoke. I guess maybe for purposes of the record I'll read it, and then I have it, Your Honor, if you care to see it, in writing.

We propose the following cautionary instruction:

"You are instructed that the fact a lawsuit is filed by Petroleum Pipe against Universal Energy Corporation is irrelevant to this case. You are also instructed that any outcome of that litigation is also irrelevant to this case. Many things happen to lawsuits. Sometimes they are voluntarily dismissed [sic]; sometimes they are settled; sometimes they go to judgment, and when they do, sometimes plaintiffs win and sometimes defendants win. Do not speculate on what happened in the lawsuit."

MR. SNOKE: Other than I would add the date up there in the first line—

THE COURT: The date?

MR. SNOKE: "The lawsuit filed in"—

MR. SEYMOUR: October, 1984.

MR. SNOKE: 1984. I have no objection to that.

MR. WILLIAMS: I believe it was against Universal and Robert Alexander.

MR. SEYMOUR: Right.

THE COURT: Would you give that to Rosanne, and she'll have it typed up?

MR. SEYMOUR: Yes, sir. Thank you.

THE COURT: Anything else? All right, let's go.

(R., Vol. XI at pp. 1059–60).

Alexander's trial counsel thus agreed with the district court that the evidence of the settlement agreement should not be introduced. The parties and the district court then agreed with Alexander's trial counsel that a cautionary instruction should be given. Thereafter, a cautionary

---

**3.** See, for example, R. Vol. IX at p. 867:
THE COURT: [T]he mere fact that subsequently something occurs could not have gone to the intent of the individual at the time.... I've been in this business too long, and there are so many, many, many reasons for settling lawsuits.... I think what you are trying to do is find some subsequent fact to justify the state of mind, not to show the state of mind. And I think that's not an appropriate way to do it.

instruction, prepared by defense counsel, was given. Under such circumstances, it would appear that Alexander waived his right to challenge the district court's ruling on the admissibility of the settlement.

WE AFFIRM.