**RAINBOW TRAVEL SERVICE, INC.,
Plaintiff–Appellee/Cross–Appellant,**

v.

**HILTON HOTELS CORPORATION and
Hotelerama Associates, Ltd.,
Defendants–Appellants/Cross–Appellees.**

**Nos. 88–1730, 88–1731.**

United States Court of Appeals,
Tenth Circuit.

Feb. 16, 1990.

Richard M. Klinge (Lu Ann Stout, with him on the briefs) of Holloway, Dobson, Hudson & Bachman, Oklahoma City, Okl., for plaintiff-appellee/cross-appellant.

John N. Hermes (Joseph Walters, with him on the briefs), of McAfee & Taft, Oklahoma City, Okl., for defendants-appellants/cross-appellees.

Before TACHA and BRORBY, Circuit Judges, and BROWN,[*] District Judge.

WESLEY E. BROWN, District Judge.

In the district court, plaintiff Rainbow Travel Service ("Rainbow") won a jury verdict against the defendants for breach of contract and fraud. The defendants-appellants argue that the district court should have dismissed the action for lack of personal jurisdiction. Additionally, appellants contend that the court committed numerous errors in the admission of evidence and in the instructions to the jury. In a cross-appeal, Rainbow argues that it should be awarded prejudgment interest on the damage award. For the reasons set forth herein we affirm the judgment of the district court with the exception of the award of damages for breach of contract.

## I. *Facts.*

The Fontainebleau Hilton is a deluxe resort hotel in Miami Beach, Florida. The hotel is operated by the defendant Hilton Hotels, Inc. ("Hilton"), a Delaware corporation, on behalf of the hotel's owner, defendant Hotelerama Associates, Ltd., a Florida limited partnership. Plaintiff Rainbow is a travel agency with its principal place of business in Oklahoma City, Oklahoma.

[*] Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

There are two Hilton hotel franchises operating in Oklahoma City, Oklahoma. The franchisor of these hotels is Hilton Inns, Inc., which is a wholly owned subsidiary of the defendant Hilton Hotels Corporation. Reservations can be made at any Hilton hotel through these franchises. Also, Hilton maintains an "800 number" in Oklahoma for taking reservations.

In recent years, the Fontainebleau Hilton has advertised in many travel publications, including the Official Hotel and Resort Guide, the Hotel and Travel Index, the Travel Agent's Hotel Sales Guide, and the Directory of Incentive Travel International. These publications are distributed throughout Oklahoma and other states. The Fontainebleau advertises in these publications in order to solicit the business of travel agents.

In the spring of 1986, Rainbow began organizing several tour packages for Oklahoma football fans who wanted to attend a University of Oklahoma versus University of Miami football game. The game was scheduled for September 26, 1986, in Miami, Florida. Rainbow initially contacted the Fontainebleau concerning the possibility of reserving hotel rooms for Rainbow's groups. After telephone calls and correspondence between the parties, the Fontainebleau sent Rainbow two contracts which called for the hotel to reserve one hundred and five rooms for Rainbow on the weekend of September 27, 1986. The second of these contracts, which is at issue in this case, provided that forty-five rooms were to be reserved for Rainbow on September 26, 1986. Rainbow executed the agreements and returned them to the Fontainebleau. In June of 1986, the Fontainebleau confirmed Rainbow's reservation by mail and requested prepayment for one night for Rainbow's groups. In response, Rainbow sent a partial payment of over $6,000.00. The Fontainebleau sent another confirmation in August and requested the remainder of the first night's payment. Rainbow then sent a final customer list and the remainder of the requested payment. The payments were made by checks drawn on Rainbow's account in Oklahoma.

Rainbow's president, A.J. Musgrove, went to Miami on September 24, 1986, to make sure that all arrangements had been made for his groups' stay at the Fontainebleau. One group from Rainbow arrived on September 25 and was accommodated as planned. Musgrove met with the hotel's tour representative, Livia Cohen, on September 24, twice on September 25, and again on the morning of September 26. Ms. Cohen assured Mr. Musgrove that everything was fine and that all of the reserved rooms would be available. When the Rainbow group arrived at the hotel on the afternoon of September 26, however, they were told by Hilton representatives that no rooms were available at the Fontainebleau. Hilton made arrangements for the group to stay at the Seacoast Towers, a hotel/apartment complex located about ten blocks away from the Fontainebleau. Rainbow subsequently filed this action in the U.S. District Court for the Western District of Oklahoma, alleging breach of contract and fraud.

## II. *Personal Jurisdiction.*

Appellants first challenge the district court's assertion of *in personam* jurisdiction. The appellants argue that they did not have sufficient contacts with Oklahoma to support an Oklahoma court's exercise of jurisdiction over them. The relevant facts on this issue, as previously set forth, are not in dispute.

The Oklahoma long arm statute provides: "A court of this state may exercise jurisdiction on any basis consistent with the constitution of this state and the Constitution of the United States." Okla.Stat.Tit. 12, § 2004 F (1984). The standards required by due process for the exercise of personal jurisdiction over nonresident defendants are well settled and will not be repeated in full here. (*See Rambo v. American Southern Insurance Company*, 839 F.2d 1415 (10th Cir.1988) for a comprehensive discussion of due process standards.) In sum, where the person over whom jurisdiction is asserted has established certain "minimum contacts" with the forum such that requiring him to defend

his interests in the forum would not offend "traditional notions of fair play and substantial justice," *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), and where he has "purposely avail[ed] [himself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), jurisdiction will be upheld.

The application of these standards to contracts made between citizens of different states is not without difficulty. The Supreme Court recently stated:

> [W]e note a continued division among lower courts respecting whether and to what extent a contract can constitute a "contact" for purposes of due process analysis. If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests ... or on "conceptualistic ... theories of the place of contracting or of performance...." Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction ..." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposely established minimum contacts with the forum.

*Burger King Corporation v. Rudzewicz,* 471 U.S. 462, 478–79, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985) [citations omitted].

 Applying these principles to the facts before us, we find that the assertion of personal jurisdiction over the defendants in Oklahoma does not offend due process.

The Fontainebleau apparently advertises in Oklahoma and throughout much of the United States and directs their solicitations at travel agents in particular. When the hotel was contacted by Rainbow Travel Service, the hotel entered into negotiations with the plaintiff in Oklahoma and came to an agreement regarding the reservation of hotel rooms. The hotel sent contracts to the plaintiff in Oklahoma for execution. Their agreement was subsequently confirmed by letters sent to the plaintiff. Significantly, the Fontainebleau required the plaintiff to partially perform the contract in Oklahoma by demanding advance payments for the rooms. These payments were substantial, totaling slightly more than $10,000.00. These contacts with the state of Oklahoma cannot be considered "random" or "fortuitous." *Cf. World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Although the defendants clearly were not physically present in the state of Oklahoma, their activities were purposefully directed at an Oklahoma resident. *See Burger King, supra* 471 U.S. at 476, 105 S.Ct. at 2184 ("Although territorial presence frequently will enhance a potential defendant's affiliation with a State and will reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.") *See also Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1195 (9th Cir.1988); *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834 (9th Cir. 1986) (The solicitation of business in the forum state that results in business being transacted or contract negotiations will probably be considered purposeful availment.) When Hilton's course of conduct is viewed as a whole, it can fairly be said that the defendant "purposely avail[ed] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla, supra.* The agreement between the parties in this case was the specific type of business transaction that the defendants

knowingly solicited. *Cf. Rambo v. American Southern Insurance Co.*, 839 F.2d 1415, 1420 (10th Cir.1988) (Purposeful availment analysis turns upon whether the defendant's contacts are attributable to his own actions or solely to the actions of the plaintiff.) *See also id.* at 1421 n. 8 (The "substantial connection" with the state in *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) was the insurance company's purposeful acts soliciting business in the forum state). Hilton's activities in this case included the solicitation of business in Oklahoma, negotiations carried out with the plaintiff in Oklahoma, and sending contracts to Oklahoma for execution. Moreover, it is clear that Hilton expected the contract to be partially performed in Oklahoma to the extent that payment from Rainbow in Oklahoma was anticipated by the parties. *See Halstead Hospital, Inc. v. Northern Bank Note Company*, 680 F.2d 1307, 1309 (10th Cir.1982). It was certainly foreseeable that a breach of this agreement would cause damage to the plaintiff in Oklahoma, *cf. Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 480, 105 S.Ct. 2174, 2186, 85 L.Ed.2d 528 (1985), and, given their substantial contact with the plaintiff in Oklahoma, the defendants could have reasonably anticipated being called to account in Oklahoma for a breach of the agreement.[1] *Cf. Continental American Corp. v. Camera Controls Corp.*, 692 F.2d 1309 (10th Cir.1982) (Contract with Kansas resident that required the defendant to make partial payment to the plaintiff in Kansas subjected defendant to jurisdiction in Kansas.)

We also find that the assertion of personal jurisdiction over the defendants comports with "fair play and substantial jus-

tice." *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). We cannot conclude that it was unfair to require the defendants to defend this suit in Oklahoma. *See McGee v. International Life Insurance Co., supra* ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.") It is somewhat disingenuous for the defendants to derive economic benefits from business dealings in the state of Oklahoma—dealings directed at a resident of the state—while disclaiming any connection with the forum state. Additionally, as the activities surrounding the agreement between the parties grew more substantial, culminating in a significant payment from the plaintiff in Oklahoma, Oklahoma's interest in providing a forum for its resident to enforce the agreement grew proportionately. *Cf. Burger King*, 471 U.S. at 482–83, 105 S.Ct. at 2187–88 ("We cannot conclude that Florida had no 'legitimate interest in holding [petitioner] answerable on a claim related to' the contacts he had established in that State.") In sum, the assertion of jurisdiction over the defendants did not violate the Due Process Clause.

Appellants argue that the formation of a contract with an out-of-state party, by itself, is not sufficient to support jurisdiction in the other party's home forum. (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Similarly, appellants argue that "random use of interstate commerce to negotiate and close a particular deal" is, by itself, insufficient. We agree. The instant case, however, does not present such a situation. We do not find jurisdiction based simply on

---

1. Our determination that jurisdiction is proper is based on "specific" rather than "general" jurisdiction. *See Burger King v. Rudzewicz*, 471 U.S. 462, 473 n. 15, 105 S.Ct. 2174, 2182 n. 15, 85 L.Ed.2d 528. Appellee Rainbow has pointed out that two Hilton Hotel franchises are operating in Oklahoma City and asks the court to find general jurisdiction based on this fact. We have not considered this fact in our determination, however, because the record before us does not demonstrate that the conduct of the franchisor, Hilton Inns, Inc., is properly attributable to its

owner, appellant Hilton Hotels Corporation. *See Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773 (5th Cir.1988) (Where a wholly owned subsidiary is operated as a distinct corporation, its contacts with the forum cannot be imputed to the parent). The record is silent as to the functional relationship between these two corporations. Although the record shows that reservations for the Fontainebleau can be made through these Hilton franchises, this fact by itself is insufficient to support general jurisdiction over the defendants.

the fact that the defendants formed a contract with an Oklahoma resident. Rather, the defendants' course of conduct taken as a whole—including the solicitation of this type of business in Oklahoma and the negotiation, execution, and partial performance of the contract in Oklahoma—demonstrates a purposeful and substantial connection with the state of Oklahoma. *See Cancun Adventure Tours v. Underwater Designer Co.,* 862 F.2d 1044, 1046 (4th Cir.1988) (Jurisdiction in Virginia upheld where the defendant advertised in Virginia, negotiated and undertook contractual obligations with a Virginia resident, mailed purchase orders to Virginia, accepted payment from Virginia and continued to deal with the plaintiff over the telephone and through the mails). *See also Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2184 n. 18. (So long as it creates a substantial connection with the forum, even a single act can support jurisdiction.)

### III. *Sufficiency of the Evidence.*

■ Appellants next argue that the evidence was not sufficient to support an award of damages for injury to goodwill or to support a finding of fraud. Our review of these issues is limited to inquiring whether the record contains substantial evidence to support the jury's verdict, viewing the evidence in the light most favorable to the prevailing party. *Kitchens v. Bryan County National Bank,* 825 F.2d 248, 251 (10th Cir.1987).

### A. Damage to Good Will

■ The jury found that Rainbow had sustained $37,500.00 in damages to its good will. Rainbow's primary witness on this issue was its president, A.J. Musgrove, who testified that he was familiar with the value of Rainbow's good will from his history with the company and from reviewing Rainbow's financial statements. Mr. Musgrove estimated that the incident at the Fontainebleau damaged Rainbow's good will in the amount of $250,000.00. His opinion was based in part on his observation that when customers are dissatisfied they tell others about it, meaning that a bad incident such as this one has a "rip-

pling effect" on a business' reputation. He indicated that this is particularly true for a travel agency because it relies heavily on its reputation in the community. Additionally, Rainbow presented the testimony of witnesses who had traveled to Miami on the Rainbow tour. These witnesses stated that they were dissatisfied with Rainbow because of the hotel incident and stated they probably would not choose Rainbow again as a travel agent.

■ Viewing this evidence in the light most favorable to the plaintiff, we find that there was substantial evidence reasonably tending to support the jury's verdict. Mr. Musgrove had extensive experience in the travel business and a foundation was properly laid for his testimony relating to the value of Rainbow's good will. Indeed, appellants did not object to Mr. Musgrove's testimony and conceded that he was qualified to express an opinion on the issue of good will. Appellants argue nonetheless that the amount of damages to good will was so uncertain as to be speculative. The rule in Oklahoma, however, is that the prohibition against recovery of damages because the loss is uncertain or too speculative in nature applies to the fact of damages, not to the amount. *Martin v. Griffin Television, Inc.,* 549 P.2d 85, 92 (Okla. 1976). "Where it is made to appear that some loss has been suffered, it is proper to let the jury determine what the loss is from the best evidence the nature of the case admits." *Hardesty v. Andro Corporation–Webster Division,* 555 P.2d 1030 (Okla.1976). Given the nature of good will, which is an intangible asset dependant upon a business' reputation, it was proper for the district court in this case to submit the question of damages to good will to the jury. *See Westric Battery Co. v. Standard Electric Co., Inc.,* 522 F.2d 986, 987 n. 2 (10th Cir.1975) ("The amount cannot and hence need not be proven with absolute certainty."). *See also Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 698 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 ("The wrongdoer may not complain of inexactness where his

actions preclude precise computation to the extent of the injury.")

B. Fraud

Appellants next argue that the evidence was insufficient to support the jury's verdict on fraud. Under Oklahoma law, fraud consists of a false material representation made as a positive assertion which is known either to be false, or is made recklessly without knowledge of the truth, with the intention that it be acted upon by a party to his or her detriment. *Tice v. Tice*, 672 P.2d 1168, 1171 (Okla. 1983). As the jury was instructed, fraud must be shown by clear and convincing evidence. *Id.* Rainbow argued in the district court that a Hilton agent's assurances that rooms would be available amounted to fraud because the representations were made recklessly without knowledge of the truth. Most of the evidence at trial centered on whether Hilton knew or should have known there would be a shortage of rooms at the Fontainebleau on September 26, 1986. Interpreting the evidence in the light most favorable to the plaintiff, we find there was sufficient evidence to raise a question of fact for the jury on the issue of fraud.

Rainbow presented evidence that Hilton accepted reservations for more rooms than were available on September 26, 1986. Hilton admitted that its policy was to book the Fontainebleau up to one hundred and fifteen per cent of its capacity, but argued that it did so based on a historic fifteen per cent "no-show" rate for guests with reservations. Hilton insisted that this policy allowed the hotel to honor almost all of its reservations. Although Hilton showed that an exceedingly high percentage of reservations were in fact honored over the course of the year, Rainbow presented evidence showing that on fifty per cent of those occasions when the hotel was operating at capacity the hotel had to dishonor reservations. Additionally, Rainbow presented evidence tending to show that Hilton was aware of a substantial likelihood that Rainbow's reservation might be dishonored. Rainbow showed that Hilton knew at least one month in advance that a large number of rooms would be closed for maintenance during September of 1986. Rainbow also argued that departure figures from the Fontainebleau showed that the hotel knew that a substantial number of people would stay over past their announced departure date. Additionally, Rainbow showed that on the date in question Hilton gave a block of rooms to a group from the University of Oklahoma even though the group had not reserved the rooms. Despite these factors, and pursuant to Hilton policy, Rainbow was not informed of the practice of overbooking and was not told there was a possibility that "guaranteed" reservations might be dishonored. Instead, Hilton assured Rainbow that the rooms would be available.

Hilton argued strenuously in the district court that the overbooking situation was due to factors beyond its control, such as guests extending their stay at the Fontainebleau and rooms being out of order for repairs. These explanations may have sounded rather hollow to the jury, however, in light of a portion of the Fontainebleau's policy manual which read:

#### Overboard

We never tell a guest we "overbooked." If an overboard situation arises, it is due to the fact that something occurred that the hotel could not prevent.
Examples:
1. Scheduled departures do not vacate their rooms.
2. Engineering problems with a room (pipe bursted, thus water leaks, air conditioning, heating out of commission, broken glass, etc.)
Always remain calm and as pleasant as possible.

(Plaintiff's Exhibit 25–2).

Hilton also argued that its agent could not have known about the lack of rooms without performing a series of complicated calculations. If this proposition is true, however, it serves as some support for the allegation that Hilton made positive assertions about the availability of rooms without knowledge of the truth.

In addition to the foregoing, the record contains much circumstantial evidence showing that Hilton had knowledge of a likelihood of dishonoring reservations at the time in question. The Fontainebleau was extremely busy during the week of Rainbow's visit. On September 22 and 23 for instance, the hotel was completely sold out and the Fontainebleau had to dishonor reservations. Although there were some vacant rooms on September 24 and 25, the number of vacancies was very few. (Pl.Ex. 65). Also, the "no-show" rate for reservations was much less during this period than the fifteen per cent annual average used by Hilton. Although Hilton's agent indicated to Mr. Musgrove on the morning of September 26 that his rooms would be available, the Night Clerk Summary for September 25 indicated that the hotel would be short of rooms even if fifteen per cent of the reservations for the 26th failed to show.

Some of the testimony at trial raised questions about the candor of Hilton's explanation concerning its treatment of Rainbow's reservations. Hilton said that it only became aware of a shortage of rooms after Mr. Musgrove had gone to the airport to pick up his group, yet when the group arrived back at the hotel they had already been assigned specific rooms at the Seacoast Towers.[2] Hilton explained that the shortage of rooms was caused by guests not checking out on the 26th, but the decision to move Rainbow was made well before checkout time on that date. Moreover, Hilton's representative testified at trial that all requests for extended stays on the 26th were refused by the hotel. Finally, members of Rainbow's group testified that several groups that arrived at the Fontainebleau after Rainbow had been bumped were given rooms at the Fontainebleau.

Clearly, the evidence in the record before us may be interpreted in more than one way. Yet, as we noted at the outset, our inquiry is limited to whether the record contains substantial evidence to support the jury's verdict. We stated in *Kitchens v. Bryan County National Bank*, 825 F.2d 248 (10th Cir.1987):

> The jury ... has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact. *Id.* We, the appellate court, do not try to second-guess the jury, nor is it our function to infer material facts or to make controlling inferences which the ... jury has not inferred or made and which, if done, would in effect constitute trial de novo.

*Id.* at 251 (citing *Rasmussen Drilling v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144 (10th Cir.1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171.) Bearing these standards in mind, we find substantial evidence in the record that Hilton was aware of having overbooked the hotel to such an extent as to create a substantial likelihood that Rainbow's reservation would be dishonored. *Cf. Marriott Corporation v. American Academy of Psychotherapists, Inc.*, 157 Ga.App. 497, 277 S.E.2d 785 (1981). Despite this, Hilton repeatedly told Rainbow that its rooms would be available and did not tell Rainbow that the group might be "bumped." Based on this and all of the evidence in the record before us, we find that a reasonable juror could find by clear and convincing evidence that Hilton recklessly made statements without knowledge of their truth, that Hilton did so with the intention that plaintiff rely on them, and that plaintiff relied on the statements to its detriment. *See Tice v. Tice*, 672 P.2d 1168, 1171 (Okla.1983) ("When fraud is properly alleged by one party and denied by the other party, the existence or nonexistence of fraud becomes a question of fact.") *See also Federal Deposit Insurance Corp. v. Palermo*, 815 F.2d 1329, 1335 (10th Cir.1987).

---

2. There was some testimony at trial that indicated common ownership of the Fontainebleau and the Seacoast Towers. The jury was entitled to weigh this fact against Hilton's assertion that it would never intentionally overbook the hotel because to do so would cause the Fontainebleau to lose money by paying for rooms at another hotel.

#### IV. Objections to Evidence.

■ Appellants contend that the district court erred by allowing certain letters and testimony into evidence during the course of the trial. In reviewing the evidentiary rulings of a trial court, we may not reverse in the absence of an abuse of discretion. *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988). We find no abuse of discretion in the trial court's rulings.

■ Appellants objected to the admission into evidence of letters from some of Rainbow's dissatisfied customers. On appeal, Hilton argues that the letters were irrelevant and unfairly prejudicial. The letters were clearly relevant to the issue of good will, however, as Rainbow was entitled to present evidence of damage to its reputation. Furthermore, we see no basis for concluding that the prejudicial effect of the letters substantially outweighed their probative value. *See* Fed.R.Evid. 403. The admission of the letters was therefore not an abuse of discretion.

■ Appellants also argue that the court erred by allowing one of plaintiff's witnesses to testify as to statements made by a bus driver in Miami. The driver was apparently employed by the Fontainebleau to drive a shuttle bus back and forth between the Seacoast Towers and the Fontainebleau Hilton.[3] The driver told Rainbow's customers that his job was to transport guests who had been bumped from the Fontainebleau and to try to keep them happy. Rainbow's customers concluded from their conversations with the driver that being bumped from the Fontainebleau was quite common. Hilton objected to this testimony on the grounds that a bus driver was not qualified to make statements concerning the Fontainebleau's reservation practices. The district court ruled that the testimony was admissible under Fed.R. Evid. 801(d)(2)(D) because it was a statement by a party's agent concerning a matter within the scope of his agency. We find no abuse of discretion in this ruling. The driver's statements were all related to the scope of his employment with the hotel.

#### V. Damages For Breach of Contract.

■ Appellants contend that the jury's award of $5,493.10 for breach of contract was not supported by the evidence. We have examined the record in detail and we agree with appellant that this figure is not supported by the record. There was little evidence presented as to damages from the breach of the contract. Rainbow did not seek damages for lost profits from the Miami trip. Indeed, the evidence was that the travel agency realized its expected profit from the trip. Rainbow only suffered out of pocket expenses of $796.00 from the breach.[4] Aside from these expenses, however, Rainbow sought to recover $8,740.00, which was the amount paid by Rainbow's clients to Rainbow for the Miami trip (excluding airfare). A.J. Musgrove testified that he would like to repay his customers since they did not get the rooms that Rainbow promised they would get. Hilton argued that this was an improper attempt to recover on behalf of Rainbow's clients. Rainbow's response was to argue that this was a necessary expense to help repair Rainbow's good will.

We agree that under the evidence in this case it was improper to allow Rainbow to recover an amount to pay back to its customers. Clearly, Rainbow had no right to recover on behalf of its clients. Thus, the amounts paid by Rainbow's customers were only relevant insofar as Rainbow's good will was concerned. Awarding Rainbow both the full extent of injury to its good will, however, *and* the means to re-

---

3. Appellants argue on appeal that there was no foundation that the bus driver was in fact employed by Hilton. A reading of the transcript discloses that Hilton did not raise this objection in the district court. (Rec.Vol.V Pp. 303–306). At any rate, there is sufficient evidence in the record to support the trial court's determination that the driver was an agent of Hilton. (Rec. Pp. 84, 95, 441, 563 and Pl.Ex. 97).

4. These expenses consisted of a payment of $768.00 to one of Rainbow's clients and a miscellaneous payment of $28.00. The client demanded a refund in Miami upon finding out that the group would not be accommodated at the Fontainebleau.

pair that damage amounts to a double recovery. Mr. Musgrove's opinion that Rainbow had suffered damage to its good will did not take into account the effect of giving refunds to its customers for the Miami trip. In fact, Rainbow's argument that its good will had been injured relied heavily on the fact that its customers had not been paid back. Yet, under the instructions on the fraud count, the jury was told that if it found fraud it should fully compensate Rainbow for any loss of good will arising from Hilton's conduct. The jury did so, awarding $37,500.00 in damages attributable to loss of good will. Rainbow cannot have it both ways. It cannot recover the full extent of damage to its good will while seeking additional money that it claims is necessary to repair the injury to good will. In view of this fact, there is simply no evidence to support the jury's award of $5,493.10 for breach of contract.[5]

Under the instructions given to the jury in this case, the defendants were entitled to a setoff of $5,892.90 on any damages arising from a breach of the parties' agreement. This setoff was due to the fact that Hilton refunded a portion of Rainbow's initial payment for the hotel rooms. Accordingly, we must offset the amount of $5,892.90 against the $796.00 loss claimed by Rainbow. When this is done, it is apparent that Rainbow is not entitled to recover any damages from Hilton for the breach of contract.[6]

### VI. *Other Issues Raised by Appellants.*

We have considered the other issues raised by appellants and we find them to be without merit.

### VII. *Cross–Appeal.*

██ In a cross-appeal, Rainbow argues that the trial court erred by denying Rainbow's claim for prejudgment interest on the damages attributable to fraud. Rainbow bases its argument on 12 Okla.Stat. § 727(A)(2), which provides in pertinent part:

> When a verdict for damages by reason of personal injuries or injuries to personal rights including, but not limited to, injury resulting from bodily restraint, personal insult, defamation, invasion of privacy, injury to personal relations or detriment due to an act or omission of another is accepted by the trial court, the court in rendering judgment shall add interest on said verdict at a rate prescribed pursuant to Section B of this section from the date the suit was commenced to the date of the verdict....

We need not address Rainbow's argument that the statute may be applied where the injured "person" is a corporation because we find that the statute does not apply to the type of damages suffered in this case. Clearly, the statute only allows prejudgment interest where the damages arise by reason of "personal injuries or injury to personal rights." In this case, the damages arose because of injury to a business asset: good will. *See Sisney v. Smalley,* 690 P.2d 1048, 1050 (Okla.1984) (Section 727 does not apply to damage to property) and *Timmons v. Royal Globe Insurance Co.,* 713 P.2d 589, 590 (Okla. 1985) (Damages awarded for embarrassment and mental suffering were deemed to be "damages by reason of personal injuries.") Because the damages here arise out of an injury to property, Rainbow may not recover prejudgment interest. *Sisney, supra.*

### VIII. *Conclusion.*

The judgment is AFFIRMED in all respects except as to the damages for breach of contract; on that issue we REVERSE

---

5. The genesis of the $5,493.10 figure is difficult to ascertain. The jury was instructed to deduct the sum of $5,892.90 from any damages it found on the contract claim because Hilton had refunded that amount to Rainbow. Thus, the jury must have found total damages for breach of contract of $11,386.00. This figure finds no support in the record. As previously mentioned, the only item sought for the breach of

contract (aside from the $796.00 out of pocket expense) was the sum of $8,740.00 paid by Rainbow's customers. (Rec. Pp. 490–94; 503–03).

6. Hilton does not seek to recover the excess of the refund over the damages suffered by Rainbow.

the judgment as unsupported by the evidence.

IT IS SO ORDERED.