**UNITED STATES of America,**
Plaintiff-Appellee,

v.

**James William BOLT,**
**Defendant-Appellant.**

No. 83–1719.

United States Court of Appeals,
Tenth Circuit.

Nov. 14, 1985.

John Thomas Hall, Tulsa, Okl., for defendant-appellant.

Kenneth Snoke, Asst. U.S. Atty. (Layn R. Phillips, U.S. Atty., and Gerald Hilsher, Asst. U.S. Atty., were on brief), Tulsa, Okl., for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, DOYLE, Circuit Judge, and BROWN, Senior District Judge [*]

WESLEY E. BROWN, Senior District Judge.

Following trial by jury the appellant James William Bolt was convicted on two counts of making material false statements to a federally insured bank, in violation of 18 U.S.C. Sec. 1014, and on two counts of mail fraud, in violation of 18 U.S.C. Sec. 1341. The two counts under 18 U.S.C. Sec. 1014 were treated as but one offense for sentencing purposes, and a sentence of eighteen months was imposed upon that conviction. In addition, appellant received a consecutive sentence of three years for mail fraud on Count III, and imposition of sentence was suspended for Count IV, the second mail fraud charge, pending a four year probation period, also consecutive to the prison terms which were imposed. Bolt now appeals his convictions, presenting various issues for our review.

[*] The Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

Before proceeding to the legal aspects of Bolt's appeal, we first address his "Special Motion to Amend Docketing Statement" which was presented shortly before oral argument to this panel. The subject matter of this motion concerns alleged "new evidence" which supposedly is relevant to this appeal. In the first instance, Bolt requests that we consider information to the effect that after his conviction, and while he has been in custody of the United States Marshal in the Medical Center at Springfield, Missouri, "certain drugs were used upon him and that certain matters were discussed, totally in violation of his Constitutional rights to silence and his right to representation by counsel." Such evidence would be totally irrelevant to our review of trial proceedings in the District Court.

In addition, Bolt contends that he is in possession of "new evidence," which indicates that there may have been tampering with the exhibits presented to the jury, in that a "mug shot" was attached to his birth certificate which had been admitted in evidence. After reviewing the entire trial transcript we are satisfied that such allegation is without merit, for the record reflects that Bolt had a "clean record," without prior convictions giving rise to "mug shots." [1]

We further note that the trial court repeatedly directed counsel to go over all of the trial exhibits which would be submitted to the jury in order to ascertain their admissibility. For instance, at the close of oral arguments, and after instructions had been given to the jury, and just prior to sending out the jury for its final deliberations, the Court specifically instructed counsel in this manner: (Vol. VIII, Record, p. 874).

"THE COURT: *Again* I'm going to ask you gentlemen now, to make sure you're satisfied, on behalf of each party, of these exhibits that are going to accompany the jury with the marshal into the jury room, to make sure no exhibits go to the jury room that were not received in evidence or should not be going to the jury room. So I'm not interested at some subsequent time in one of you lawyers taking the position that exhibit thus and so went into the jury room and it shouldn't have because I'm placing the onus on you at this time to get together with the clerk and make sure his records jibe with yours concerning the proper exhibits received in this case and the proper exhibits that go into the jury room. Will you please do so." (Emphasis supplied.)

Bolt's Motion to Amend the Docketing Statement is Denied.

In order to give some background to our discussion of the issues in this case, we briefly summarize the ten count Indictment which was filed in open court on August 11, 1982.

Count I of the Indictment charged that on February 9, 1982, Bolt made a material false statement in a loan application to the federally insured City Bank and Trust Company of Tulsa in that he stated and represented that his true and correct name was Russ J. Woolf, when in fact his true and correct name was James William Bolt, all in violation of 18 U.S.C. Sec. 1014.[2]

Count II of the Indictment charged that on that same date and in that same loan application, Bolt made a material false statement in that he stated and represented that he had purchased and was the owner of a 1981 Gibson Houseboat, 36 feet long,

---

1. At the panel's request, the Government filed response to Bolt's motion. It was noted that while a passport type photo was attached to the certificate when it was seized from his office pursuant to warrant, that photo was removed before the exhibit was introduced into evidence. In any event, Bolt never denied that his birth name, as it appeared on the certificate, was James William Bolt. His contention was that he had legally changed his name in Liberia to Russell James Woolf.

2. Section 1014 provides in pertinent part that:
   "Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ..." shall be guilty of an offense against the United States.

of a certain serial number, when in truth and fact he had not purchased, and did not own such a boat, in violation of 18 U.S.C. Sec. 1014.

Count III of the Indictment charged that on May 13, 1982 Bolt, with intent to defraud Copy Systems of Tulsa, did falsely make and counterfeit "a bank note in the form of a check," payable to Copy Systems of Tulsa, in the amount of $3,287.75, drawn on the National Bank of Liberia, Monrovia, Liberia, whose bank notes are intended by the laws of that country to circulate as money, in violation of 18 U.S.C. Sec. 482.[3]

Counts IV, V, and VI of the Indictment contained charges similar to that of Count III, pertaining to Liberian "bank notes" issued in various amount on May 17, May 15 and June 3, 1982, with intent to defraud Clark Country Chevrolet, City Bank and Trust Company, and Kathy Martin, all in violation of 18 U.S.C. Sec. 482.

Counts VII, VIII, and IX, charged Bolt with use of the mails on various dates in furtherance of a scheme to defraud the Bank of Oklahoma in violation of 18 U.S.C. Secs. 1341 and 2.[4] The scheme, as described in Count VII, was as follows:

"From on or about December, 1981, to on or about July, 1982, in the Northern District of Oklahoma, and elsewhere, JAMES WILLIAM BOLT, did devise and did intend to devise a scheme and artifice to defraud and to obtain money, credit and property by means of false and fraudulent pretenses, representations and promises, from the Bank of Oklahoma, Tulsa, Oklahoma, which would be induced to advance credit and pay money based on the fraudulent representations contained in a credit card application and counterfeit checks drawn on the National Bank of Liberia, Monrovia, Liberia, the said defendant well knowing at the time

that the pretenses, representations and promises would be and were false when made. Said scheme and artifice to defraud, so devised and intended to be devised by the defendant was in substance as follows:

1. It was part of said scheme and artifice to defraud that on or about December 4, 1981, defendant ... would and did make application in a false name to the Bank of Oklahoma for a credit card, said application containing false and fraudulent information for the purpose of inducing the Bank of Oklahoma to advance credit to the defendant.

2. It was further a part of said scheme and artifice ... that defendant JAMES WILLIAM BOLT would and did periodically submit counterfeit checks drawn on the National Bank of Liberia, Monrovia, Liberia, to the Bank of Oklahoma for credit to defendant's credit card account for the purpose of inducing the Bank ... to extend further credit to the defendant."

The specific offense charged in Count VII was the mailing on December 4, 1981 of a letter containing an application for a VISA credit card account to the bank.

The offense charged in Count VIII was the mailing on May 12, 1982 of a letter containing a check for $1,000 drawn on an account entitled Saturation Systems at the National Bank of Liberia.

The offense charged in Count IX was the mailing on June 2, 1982, of a letter containing a check for $2,000 payable to VISA, and drawn on the same account at the National Bank of Liberia.

Count X concerned another scheme devised from April to May, 1982, whereby Bolt allegedly intended to defraud and obtain property by means of false and fraud-

---

**3.** Section 482 concerns foreign bank notes. It provides that:

"Whoever, within the United States, with intent to defraud, falsely makes, alters, forges, or counterfeits any bank note or bill issued by a bank or corporation of any foreign country, and intended by the law or usage of such foreign country to circulate as money, such bank or corporation being authorized by the laws of

such country,...." commits an offense against the laws of the United States.

**4.** Section 1341 provides that whoever, having devised any scheme or artifice to defraud, "for the purpose of executing such scheme ... places in any post office or authorized depository for mail ... any matter or thing whatever," commits an offense against the laws of the United States.

ulent pretenses from Frances Moore, a real estate agent in Arkansas, whereby Bolt sought to defer rent payments he owed, and to induce Ms. Moore to sell property to him based upon the fraudulent payment of a counterfeit check drawn on the National Bank of Liberia. This scheme was described as follows:

"1. It was part of said scheme and artifice to defraud that on or about April, 1982, defendant ... would and did negotiate with Frances Moore, acting in her capacity as real estate agent, for the purchase of property located at 147 White Oak Lane, Garfield, Arkansas."

"2. It was further part of said scheme and artifice to defraud that as payment for the property described above, the defendant ... would and did mail a fraudulent and counterfeit check drawn on the National Bank of Liberia, Monrovia, Liberia."

The specific offense charged in Count X was the mailing on May 18, 1982 of a letter and check in the sum of $275,000.00, payable to Frances Moore Real Estate and Tom Lambert and Mary Lambert, drawn on an account entitled Saturation Systems at the National Bank of Liberia, all in violation of 18 U.S.C. Secs. 1341 and 2.

Prior to trial Counts VII and IX were dismissed by the Government because proof of mailing was not available. Counts III, IV, V, and VI were also dismissed by the Government because it determined that the counts had been brought under the wrong statute since the Liberian checks referred to in those counts were not "bank notes" within the meaning of 18 U.S.C. Sec. 482. (Vol. IV, Record, pp. 10, 11).

Four counts remained for trial—Counts I and II, the charges of making false statements to an insured bank, and Count VIII (renumbered Count III) charging mail fraud in connection with the $1,000 check payable to VISA, mailed May 12, 1982, and Count X (renumbered Count IV), charging

mail fraud in connection with the $275,000 check mailed to Frances Moore.

As his first proposition in this appeal, Bolt contends that the trial court erred in combining Counts I and II and treating them as one offense, instead of dismissing them as multiplicious, or requiring the Government to elect the count upon which it would go to trial.[5] The Government agrees that under the law, the making of several false statements in one single document constitutes only a single offense under 18 U.S.C. Sec. 1014. *United States v. Sue*, 586 F.2d 70, 71 (8th Cir.1978); *United States v. Sahley*, 526 F.2d 913, 918 (5th Cir.1976). In *Sue*, defendant received concurrent sentences on multiplicious counts under Sec. 1014, but execution on these sentences was suspended by the trial court. The appellate court ordered the vacation of one of those concurrent sentences, but because the counts were similar, and execution had been suspended, it was determined that defendant need not be resentenced. In *Sahley*, the defendant was convicted of making false assertions under Sec. 1014. His conviction was affirmed, but the sentences were vacated and the case remanded with directions to resentence defendant "as for a single violation" of the statute.

It has been noted that "(t)he principal danger raised by a multiplictious (sic) indictment is the possibility that the defendant will receive more than one sentence for a single offense." *United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir. 1974). One remedy for multiplicity is an election of counts by the prosecutor prior to trial. Another remedy may be the use of appropriate jury instructions. *United States v. Sue, supra*, 586 F.2d at 71. In this case, the jury was appropriately and fully instructed as to the nature of the single offense under Sec. 1014, Vol. VIII, Record p. 863:

"Now, Counts 1 and 2 each charge the defendant with knowingly making a false

5. On September 15, 1982, the trial court determined to leave both counts in the Indictment, and, in the event a guilty verdict was returned on both, a single sentence on both would be imposed. Record Supp. Vol. III, p. 21. On April 14, 1983, the trial court again ruled that Counts I and II would proceed as a single offense. Record, Vol. II, pp. 9–10, p. 46.

statement on a loan application. Each count refers to a separate statement on the same loan application. Since both allegedly false statements were made on the same loan application, the defendant can be found guilty of but one violation of the law, even if you found that the defendant is guilty of both counts. It will be your function as the jury to determine if the government has established the defendant's guilt beyond a reasonable doubt of either or both Counts 1 and 2."

"You are advised that with the exception of Counts 1 and 2, a separate crime or offense is charged by each of the counts contained in the indictment herein as to Counts 3 and 4. Each crime or offense as charged and the evidence applicable thereto should be considered separately. The fact that you may find the defendant guilty or not guilty of one crime or offense should not control your verdict with reference to any of the other crimes or offenses charged. *As I have stated here, Counts 1 and 2 are one offense.* Count 3 is one separate offense. Count 4 is one separate offense." (Emphasis supplied.)

The evidence of the two false statements described in Counts I and II of the Indictment was overwhelming. The evidence established that in applying for a loan to finance the purchase of the houseboat described in Count II, Bolt submitted a fabricated bill of sale for a non-existent boat, bearing a serial number never used by the purposed manufacturer of that boat, the purported sale being made by a non-existent firm. The evidence concerning Bolt's use of false name on the loan application was likewise substantial. This included the testimony of appellant's receptionist as to his use of fictitious names in his business dealings, and his remarks concerning procurement of credit cards by change of name and social security numbers. In addition, other evidence established that Bolt, using the name Russell Woolf, also submitted a bank application, gluing the name of a fictitious father—"A.J. Woolf"—residing at a fictitious address in New York City.

As noted, the jury returned verdicts of guilty on Counts I and II. There is no question of a "general verdict," or the sufficiency of the evidence on either count. *Cf. United States v. Dota,* 482 F.2d 1005 (10th Cir.1973), *cert. den.* 414 U.S. 1071, 94 S.Ct. 583, 38 L.Ed.2d 477. The trial court imposed only one sentence upon the single offense contained in Counts I and II. Bolt sustained no prejudice by reason of his conviction upon these counts. There was no error in the trial court's instructions to the jury or the imposition of a single sentence of eighteen months on the Sec. 1014 offense.

Bolt next contends that the trial court erred by refusing to order the United States to produce "certain exculpatory evidence" or to grant him a trial continuance on April 4, 1983, in order to obtain such evidence from Liberia. Bolt claims that on February 15, 1983, the Court ordered the United States to produce certain documents from Liberia concerning his name change. He complains that "authenticated" documents were not produced by the United States "as they would have been had the United States produced the documents through their embassy services." Bolt argues that because the documents he had were not authenticated, he "would have to waive his Fifth Amendment right to silence in order to get the exculpatory documents into evidence." [6]

Our examination of the record discloses that the case was first removed from the December, 1982 jury docket in order to allow Bolt to obtain evidence from Liberia. Record, Vol. I, Items 39, 42.

■ On February 15, 1983, a hearing was had on Bolt's motion for a continuance in order to allow him to receive documents which were to be delivered to him via the United States Embassy in Liberia. The Court did not "order" the Government to produce exculpatory evidence at that time, as alleged by Bolt. Instead, the Govern-

---

**6.** Bolt did not take the stand, and did not waive any Fifth Amendment "right to silence."

ment agreed to assist him in transferring documents, which he had obtained in Liberia, to the United States by means of embassy courier service. These documents were not "exculpatory evidence in possession of the government" within the meaning of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct.2d 215, 10 L.Ed.2d 215 (1963).

At a later pre-trial hearing, held on April 14, 1983 to determine the extent of the Government's duty to deliver "authenticated" documents, it appeared that Bolt had delivered one document to the embassy, without authentication, or acknowledgement of purported official signature. The Court found that the burden was on Bolt to authenticate any documents pertaining to name change. The Court particularly noted that the document in question, even if it had been authenticated, reflected upon its face that Bolt's name change was not finalized until *February 7, 1983,* long after the events described in the Indictment. Record, Vol. II, pp. 37–38. In overruling Bolt's motion to cite the Government for contempt because of failure to hand over exculpatory evidence, the Court ruled:

"The Court thinks that the citation for contempt should be overruled as it is my understanding that the essence of the government's obligation in assisting and obtaining authentication of relevant documents was to provide reasonable assistance there at the embassy in Liberia, but the Court does not deem it was the obligation of the government employees there at the embassy to proceed in an investigative fashion to leave the embassy and go out and physically track down and obtain signatures of a person in reference to a particular document. The obligation to obtain a proper document for authentication and obtain the person to authenticate the document, that is to acknowledge their signature on any particular document, before the proper person at the embassy I think would be the function of the defendant in this case, and the Court thinks this has gone along enough months that if any proper authenticating documents were to come for-

ward they would have been presented by now."

"I think it's a very telling point in this case that Defendant's Exhibit No. 2 reflects, assuming it's a proper document.... (that) at the times set forth in the relevant counts in this indictment, James William Bolt was not and had not been determined by any appropriate legal agency or court any place in the world to be Russell James Woolf. Even if Defendant's 2 is a proper document, the name change didn't officially take place until February 7 of 1983." Record, Vol. II, pp. 45–46.

Upon the record, the Court properly overruled Bolt's motion for a contempt citation. There was no violation of the rule established in *Brady v. Maryland.*[7]

█ Bolt next contends that the trial court erred in not producing the grand jury testimony of F.B.I. Agent Thomas McLain, in violation of the "Jencks Act," 18 U.S.C. Sec. 3500, which requires that transcripts of any grand jury testimony by Government witnesses must be produced for a defendant's use in cross examination. The Government intended to offer trial testimony from Agent McLain, who had directed the search of appellant's business premises. He was unable to testify because a transcript of his grand jury testimony could not be prepared in time for trial. Two other agents who had assisted in the search did testify concerning various items which they personally seized during the search. Bolt objected to this testimony, complaining that the "chain of custody" of such evidence was not complete, absent the testimony of Agent McLain. Bolt claims that subsequently Agent McLain was wrongfully allowed to testify, "under the guise of" Rule 614(a) and (b) and Rule 611(a) of the Federal Rules of Evidence, being "called on behalf of the plaintiff (the United States)."

This is a deliberate misstatement of the record. The trial court, under Rules 611 and 614, called Agent McLain as the

---

**7.** Copies of the documents in question appear as Item 44, Vol. I of Record, pp. 154–156.

Court's witness, outside the presence of the jury, for the purpose of making an appellate record concerning the disputed chain of custody.

Rule 611(a) provides that the "court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... make the interrogation and presentation effective for the ascertainment of the truth." Rule 614 provides that the court "may, on its own motion ... call witnesses, and all parties are entitled to cross-examine witnesses thus called." [8]

Appellant has not suggested any prejudice resulting from the testimony of McLain which pertained solely to the "chain of custody" question. None of the items seized and identified by the two agents who did testify were similar to blood samples or other items which might be affected or changed while out of the agents' custody. The items of evidence included photos, lettering sets, drafting tools, and various documents and files marked with each agent's initials or identifying marks. Bolt has not pursued on appeal any of his trial objections relating to the chain of custody of such evidence—this was the sole subject matter of McLain's testimony before the Court. Bolt has failed to assert or to show any prejudice arising from the testimony of Agent McLain. This claim of error is without merit.

Bolt next contends that the Court erred in admitting evidence of other crimes, particularly evidence relating to Counts III, IV, V and VI of the Indictment which had been dismissed, contrary to Rules 403 and 404(b) of the Federal Rules of Evidence.

The evidence in question included that pertaining to the general fraudulent character of Bolt's business, Saturated Systems, Inc., various fraudulent checks drawn on an account for Saturation Systems at the National Bank of Liberia, an account which did not exist in any form or nature, and other applications for credit in the false name, Russ Woolf, which contained inconsistencies with the City Bank application.

Rules 403, 404 of the Federal Rules of Evidence permit the introduction of relevant evidence of other crimes to prove motive, identity, intent, knowledge, a mode of operation, and/or absence of mistake, so long as its probative value is not outweighed by its prejudicial effect.

■ Our review of the evidence establishes that Bolt was involved in elaborate schemes to defraud various companies and individuals. These schemes were built upon a fictitious business enterprise, known as Saturation Systems, which he ran from a small Tulsa office. The Government has aptly described this business as being an enterprise which included a group of imaginary employees, engaged in developing imaginary products and services, located in various imaginary locations in the United States, Scotland, Norway and other overseas locations. The schemes involved the sophisticated use of computers and telex machines and the preparation of various false documents created by Bolt, who appeared to be a skilled draftsman and printer. Central to Bolt's business operations was the use of fictitious checks drafted and drawn by Bolt on a non-existent bank account at the National Bank of Liberia. We find that all of this evidence was admissible as probative of the questions of the identity

---

**8.** The Court noting that Bolt had taken the position that before McLain could testify he had to be presented with all Jencks material, including the grand jury testimony of McLain, stated, at p. 667, Vol. VII of the Record:

"Very well. Then for that reason Mr. McLain is not being permitted to testify here, but the Court desired that the record here, out of the hearing of the jury, for any appellate court involved in this matter, should we ever reach that point, have the testimony of Mr. McLain, the case agent, concerning pertinent documents that have been offered in evidence here about which the defendant has raised a dispute about the chain of custody, and the Court concluded, based upon the testimony of the particular witnesses involved, that the chain of custody issue would only go to the weight of the evidence and would not prohibit those documents from coming in evidence. So please, Mr. Hilsher, put on Mr. McLain on this subject."

of James William Bolt/Russell Woolf, the existence of the schemes to defraud, the question of intent, and the absence of mistake, inadvertence, etc. Such evidence "(d)id not constitute excludable 'other crimes' evidence but proof highly probative of the existence of the very scheme(s) generating the government's case." *United States v. Roylance,* 690 F.2d 164, 168 (10th Cir.1982).

The trial court did not abuse its discretion in the admission of such evidence.

Bolt next complains that the trial court erroneously allowed the United States to reopen its case for the purpose of presenting additional evidence concerning the federally insured status of the City Bank and Trust Company. It was Bolt's contention that the Government failed to prove that the bank was insured at the time of his loan application.

The record reflects that Jerry Vaughn, Vice President of City Bank and Trust testified about the circumstances surrounding Bolt's loan application, and then testified as to the bank's insured status in this manner (Vol. VI, Record, p. 433):

"Q. Now, is City Bank and Trust Company, are its deposits insured by Federal Deposit Insurance Company?

A Yes, sir, they are."

Bolt made no attempt to cross-examine this witness on the issue.

Such testimony has been held sufficient to establish the element of insured status. See *United States v. Knop,* 701 F.2d 670, 672 (7th Cir.1983); *United States v. Rangel,* 728 F.2d 675, 676 (5th Cir.1984), *cert. den.* —— U.S. ——, 104 S.Ct. 2689, 81 L.Ed.2d 883. At the close of the evidence, Bolt moved for judgment of acquittal upon the ground that FDIC insurance was not pled or proven by the Government. Vol. VII, Record, p. 738.[9] The basis for such motion was that the Government was required to prove insured status at the time the alleged offense was committed, under

such cases as *United States v. Maner,* 611 F.2d 107 (5th Cir.1980), and *United States v. Plattenburg,* 657 F.2d 797 (5th Cir.1981).

We fully agree with the proposition that the insured status of a financial institution at the time of the offense is an essential element to be proved by the Government in all prosecutions under Sec. 1014. In *Plattenburg, supra,* at the close of the case, defendant moved for judgment of acquittal upon the group that there was no proof that the bank was insured. The district judge denied the motion, and allowed the Government to reopen its case to offer further proof. The Government declined to recall any witnesses, but offered into evidence a 1972 certificate of FDIC insurance. This was the only evidence of insured status. The offense in question was committed in late 1979. Under these circumstances, the Court determined that the Government's proof of insurance was clearly insufficient and defendant's conviction was reversed.[10]

In contrast to the *Plattenburg* situation, the Court below allowed the Government to reopen its case to introduce the bank's FDIC certificate, a City Bank expense check which paid the insurance premium for the six month period of January 1, 1982 through June 30, 1982, and the testimony of the vice president of operations who was able to state, from her own knowledge, that the bank was covered by FDIC insurance on February 9, 1982, the date of the offense. Vol. VIII Record, pp. 784–788.

The question of the order of proof and permission to reopen the evidence rests within the discretion of the trial court. *United States v. Alderete,* 614 F.2d 726, (10th Cir.1980); *United States v. Montgomery,* 620 F.2d 753 (10th Cir.1980), *cert. den.* 449 U.S. 882, 101 S.Ct. 232, 66 L.Ed.2d 106. The rationale for the rule is appropriately stated by the Court in *Montgomery,* 620 F.2d at 757:

---

**9.** Counsel for Bolt later admitted that insured status had been pled.

**10.** In *United States v. Maner, supra,* a bank robbery case, the proof consisted of an insur-

ance certificate issued five years before the offense, plus the testimony of a witness that copies of the certificate were posted in public view on each teller's window. The court there held the evidence was "just barely" sufficient.

"The trial court has some interest in seeing that justice is done and in seeing that all of the facts are presented ... the court's exercise of discretion should not be disturbed. The evidence in question was in effect a formal matter and the defendant ought not to be allowed to utilize the inadvertence in order to gain an unjust result."

The trial court did not abuse its discretion in allowing the Government to reopen its case for the purpose of fully exploring the circumstances of the bank's insured status.

Finally, Bolt contends that the Government failed to prove that the "instruments" alleged in the Indictment were counterfeit foreign bank notes.

As previously noted, Counts III and IV charged Bolt with violation of the federal mail fraud statute, 18 U.S.C. Sec. 1341, which prohibits the placement into the mail channels of "any matter or thing whatever" for the purpose of furthering his schemes to defraud. The term "counterfeit foreign bank note" is not an element of any charge submitted to the jury.[11] In the two mail fraud counts, reference was made to "fraudulent and counterfeit checks drawn on the National Bank of Liberia." There was substantial evidence that the checks in question, which were prepared and drafted by Bolt, were drawn upon a fictitious and non-existent bank account, without any validity whatsoever. Appellant's contentions pertaining to "foreign bank notes" are without merit.

The judgment of the district court is AFFIRMED.

---

**11.** Counts III, IV, V, and VI, which concerned falsely made or counterfeit foreign bank notes, designed to circulate as money, according to foreign law, were dismissed prior to trial.