UNITED STATES of America,
Plaintiff–Appellee,

v.

Randolph R. McNEAL, a/k/a Bobby
McNeal, Defendant–Appellant.

No. 88–1042.

United States Court of Appeals,
Tenth Circuit.

Jan. 20, 1989.

David J. Phillips, Branch Chief, Federal Public Defender (Charles D. Anderson, Federal Public Defender, with him on the brief), District of Kansas, Kansas City, Kan., for defendant-appellant.

Julie A. Robinson, Asst. U.S. Atty., Kansas City, Kan. (Benjamin L. Burgess, Jr., U.S. Atty., D. Kan., with her on the brief), for plaintiff-appellee.

Before McKAY, TACHA, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

On September 6, 1985, two persons held up a credit union in Kansas City, Kansas, and escaped with $4,966.09. During the course of the robbery one of the robbers took a Colt Diamondback .38 caliber revolver from the security guard at the credit union. On July 11, 1986, Jockenna O'Neal was arrested on a disturbance charge and at the time of her arrest she had in her possession a Colt Diamondback .38 caliber revolver. O'Neal stated that she had purchased the revolver from Terry McNeal in April 1986. A check of the serial number revealed that the weapon recovered from O'Neal was the weapon taken in the credit union robbery. The investigating officers then showed O'Neal a series of surveillance photos taken during the course of the robbery, and she identified Terry McNeal and his brother, Bobby McNeal, as the two robbers.

By a second superseding indictment filed on October 27, 1987, Randolph R. McNeal, also known as Bobby McNeal, and Terry Lee McNeal were charged in the first count of a three-count indictment with taking by force and violence from the persons of Pamela Hecht, Gloria Oliver, and Paulette Reyes on September 6, 1985, $4,966.09 in coin and currency belonging to the Mid-American Credit Union, Challenger, K.C. office located at 720 Simpson Street, Kansas City, Kansas, whose "deposits" were insured by the National Credit Union Administration. In that same count it was further alleged that during the course of the robbery the McNeal brothers assaulted and put in jeopardy the lives of named credit union employees by the use of a handgun, all in violation of 18 U.S.C. § 2113(a) and (d) (1984).

In Count 2 of the indictment, Bobby McNeal was charged with using a chrome .22 caliber automatic handgun in the robbery of the credit union, in violation of 18 U.S.C. § 924(c) (1976).

In Count 3, Terry McNeal was charged with using a Colt Diamondback revolver in the robbery of the credit union, in violation of 18 U.S.C. § 924(c) (1976).

In a joint trial, a jury convicted the McNeals on all three counts. Bobby McNeal was sentenced to twenty-five years imprisonment on Count 1, and to five years on Count 2, the two sentences to be served consecutively. Pursuant to 18 U.S.C. § 3663 (1985), Bobby McNeal was ordered to make restitution in the amount of $2,483.04 and, pursuant to 18 U.S.C. § 3013 (1985), he was assessed $50 on each count, payable to the Crime Victim's Fund.

Terry McNeal was sentenced to fifteen years imprisonment on Count 1, and five years on Count 3, the two sentences to be served consecutively. He was also ordered to make restitution to the credit union in the amount of $2,483.04 and to pay to the Crime Victim's Fund $50 per count.

By separate appeals with different counsel, the McNeals seek reversal on several grounds, some of which, though not all, overlap. The appeals were not consolidated and will be disposed of in separate opinions. The background facts will be set forth in this opinion and will not be repeated in the opinion in Terry McNeal's appeal, 865 F.2d 1173.

The two suspects who robbed the credit union wore disguises and large dark sunglasses. One wore a striped shirt and a fishing hat. The other wore an Afro wig, was dressed in a blue jogging suit and had a woman's facial make-up.

As indicated, the robbers made a successful escape from the scene of the robbery. Apparently the "break" in the case occurred some ten months later when Jockenna O'Neal was arrested and the revolver taken from her at the time of her arrest was determined, through a check of the serial number, to be the revolver taken from the guard in the robbery of the credit union. O'Neal told the police investigating the case, and later so testified at trial, that she bought the revolver from Terry

McNeal in April 1986. She also identified the robbers in the surveillance photos taken during the robbery as Terry and Bobby McNeal.

It was established at trial, at least *prima facie*, that the robber, who assaulted the security guard and knocked the guard down three times during the assault, stole his gun and pistol-whipped him was the person wearing the fishing hat, and that the robber wearing the Afro wig was the person who went behind the teller's cage, fired his pistol at the security guard, and demanded money from the tellers. The government's theory of the case was that Terry McNeal was the robber in the fishing hat who assaulted the security guard, and Bobby McNeal was the robber who collected the money in the teller's cage.

The testimony of the eye witnesses to the robbery, however, was not uniform. The security guard who was assaulted, and from whom the Colt Diamondback revolver was taken, could not identify either of the defendants as being one of the robbers. A customer who was in the credit union at the time of the robbery identified Terry McNeal as being the one who assaulted the guard, but he was unable to identify Bobby McNeal as the other robber. Paulette Reyes, a teller, incorrectly identified Terry McNeal as the robber who went behind the teller's cage and collected the money. However, Pamela Hecht, an assistant manager, testified that it was Terry McNeal who assaulted the guard and identified Bobby McNeal as the robber who went behind the teller's cage and obtained the money.

Defense counsel called another customer and another teller who could not identify either of the defendants as the robbers. Terry McNeal called several witnesses in an attempt to establish his alibi. However, neither Terry nor Bobby McNeal testified.

## I. *"Accounts" vis-a-vis "Deposits"*

■ Count 1 charged a violation of 18 U.S.C. § 2113(a) and (d). Section (a) provides that whoever by force takes money belonging to a "bank" or "credit union" shall be fined not more than $5,000 or imprisoned not more than 20 years, or both. Section (d) provides that whoever violates section (a) and in so doing assaults a person by use of a dangerous weapon shall be fined not more than $10,000 or imprisoned not more than 25 years, or both. Section (f) provides that the term "bank" includes "any bank the *deposits* of which are insured by the Federal Deposit Insurance Corporation" (emphasis added). Section (h) states that the term "credit union" includes a "[s]tate-chartered credit union the *accounts* of which are insured by the Administrator of the National Credit Union Administration" (emphasis added). 18 U.S.C. § 2113 (1984).

The credit union in the instant case was a state-chartered credit union. The government alleged in each of the three counts that the *"deposits* of Mid–American Credit Union, Challenger, K.C. office were insured by the National Credit Union Administration" (emphasis added). Why the government eschewed the use of the term "accounts," and used the term "deposits," is not clear. In drawing an indictment, the safer course is to use the language of the statute. In any event, according to appellant, the use of the term "deposit" is appropriate where a bank is involved, but inappropriate where a credit union is involved and, therefore, is fatal to the indictment. In other words, appellant argues that referring to "deposits" of the credit union, instead of "accounts," which is the statutory language, renders the entire indictment subject to a motion to dismiss for failure to state an offense. Appellant further contends that this error was compounded by the court's instructions, which also referred to the credit union's "deposits," as opposed to "accounts."

Appellant has not drawn our attention to any case holding that an allegation in an indictment that a state-chartered credit union had its "deposits"—as opposed to "accounts"—insured by the National Credit Union Administration is such a departure from the statute as to render an indictment subject to a motion to dismiss for failing to charge a crime. An indictment is sufficient if it contains the elements of the offense

charged and fairly informs the defendant of the charge against which he must defend, and, secondly, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *United States v. Darrell*, 828 F.2d 644, 647 (10th Cir.1987) (citing *United States v. Rudetsky*, 535 F.2d 556, 562 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed. 2d 81 (1976)); *United States v. Salazar*, 720 F.2d 1482 (10th Cir.1983), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985). Although it is quite true that the statute refers to a bank's "deposits," and a credit union's "accounts," we decline to hold that referring to a credit union's "deposits," instead of "accounts," is fatal.

In *United States v. Janoe*, 720 F.2d 1156 (10th Cir.1983), *cert. denied*, 465 U.S. 1036, 104 S.Ct. 1310, 79 L.Ed.2d 707 (1984), the indictment alleged that the insuring agency was the Federal Deposit Insurance Corporation (FDIC), when it should have been described as the Federal Savings and Loan Insurance Corporation (FSLIC). *Id.* at 1158–61. There we held that notwithstanding the erroneous reference to FDIC, the indictment specifically informed the defendant of the nature of the alleged offense and the statutory violation charged, and that the erroneous reference did not subject the defendant to the possibility of double jeopardy. *Id.* at 1159. In the instant case, although there is a technical difference between a bank "deposit" and a credit union "account," each represents money given by one to another, for the benefit and use of the former at his direction. Therefore, the indictment in the present case was sufficient.

Additionally, in line with the foregoing discussion, it was not error for the district court to instruct the jury that an essential element of Count 1 was that the credit union's "deposits" were insured by the National Credit Union Administration.

## II. *Federal Insurance*

■ An essential element in each of the three counts was that the "Mid–American Credit Union, Challenger, K.C. office" had its "deposits," or accounts, regardless of how such be characterized, insured by the National Credit Union Administration. Absent federal insurance there would be no federal jurisdiction and, in such circumstance, the McNeals would have been prosecuted in the state courts of Kansas. Appellant, however, contends that the evidence in the instant case was insufficient to establish that the credit union carried federal insurance. Such is not our reading of the record.

In the present case, exhibit 26 is a certificate from the National Credit Union Administration showing that a predecessor credit union to Mid–American was federally insured. There was testimony that Mid–American did not receive a yearly updated certificate, even though insurance premiums were paid by wire transfer the first of each year for the preceding year. Mary Pope, a senior vice president of Mid–American, testified that the deposits of Mid–American were federally insured on the date of the robbery and exhibits 27 and 28 were offered and received into evidence in support of her testimony regarding federal insurance.

In aid of our analysis is *United States v. Bolt*, 776 F.2d 1463 (10th Cir.1985). In *Bolt*, we held that an FDIC certificate, a cancelled premium check, and testimony from a bank's vice president that bank deposits were federally insured constituted sufficient proof of federal insurance. *Id.* at 1471. *Bolt* is distinguished from *United States v. Platenberg*, 657 F.2d 797 (5th Cir.1981), where a seven-year-old certificate, and nothing more, was held to be insufficient to show federal insurance on the date of a robbery. All things considered, there was sufficient evidence to show that Mid–American had federal insurance.

## III. *Instruction No. 13*

■ By Instruction No. 13 the jury was first advised that Counts 2 and 3 were distinct offenses from the offense charged in Count 1. In that connection, the jury was then instructed as concerns both defendants that if the jury found the defendants not guilty under Count 1, then the

jury must find the defendants not guilty under Counts 2 and 3, and, conversely, if the jury found the defendants guilty under Count 1, then the jury must find the defendants guilty under Counts 2 and 3.

On appeal, Bobby McNeal objects to that part of the foregoing instruction which states that if the jury finds him guilty under Count 1, it must find him guilty under Count 2. He, of course, has no objection to the first part of that same instruction which instructed the jury that if it finds him not guilty under Count 1, it must find him not guilty under Count 2. Nevertheless, his argument is that the instruction invades the province of the jury and, in effect, instructs the jury to find him guilty under Count 2, no matter what. We are not in accord with that argument.

In the first place, our study of the record indicates that no such objection to Instruction No. 13 was voiced in the district court. Accordingly, it will not be considered by us for the first time on appeal unless it be plain error, which it is not. *Big Horn Coal Company v. Commonwealth Edison Company,* 852 F.2d 1259, 1274 (10th Cir.1988) (citing *Ryder v. City of Topeka,* 814 F.2d 1412, 1427–48 (10th Cir.1987)); *see also EEOC v. Prudential Fed. Sav. & Loan Ass'n,* 763 F.2d 1166, 1174 n. 5 (10th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).

Bobby McNeal's argument relates only to his conviction under Count 2, and has no effect on his conviction under Count 1. The instruction advises the jury that if it convicts Bobby McNeal under Count 1, then, and only then, it must convict Bobby McNeal under Count 2. The purpose behind this instruction is to head off a possible post-trial motion of inconsistent verdicts, for example, the jury might find Bobby McNeal not guilty under Count 1, but guilty under Count 2, or vice versa. The instruction is conditional, that is, the jury must first determine whether Bobby McNeal is, or is not, guilty under Count 1.

The one case relied on by appellant, *United States v. Mentz,* 840 F.2d 315 (6th Cir.1988), is inapposite. There a divided panel, in the Sixth Circuit, held that it was reversible error for a district judge to instruct a jury in a bank robbery case that the bank was a national bank and that its deposits were insured by FDIC. In the present case, the jury was not instructed on which result it should reach on any element of the crime.

Rather, the present case is more like *United States v. Harvey,* 756 F.2d 636 (8th Cir.), *cert. denied, Harvey v. United States,* 474 U.S. 831, 106 S.Ct. 97, 98, 88 L.Ed.2d 79 (1985). In that case the defendant was charged in separate counts with kidnapping and use of a firearm in the kidnapping. In this regard, the jury was instructed that if they found the defendant not guilty of kidnapping, they must find him not guilty on the firearm charge, and, conversely, if they found the defendant guilty of kidnapping, they should find him guilty of the firearm charge. In *Harvey,* as in the instant case, no objection was made in the trial court to the instruction. On appeal when the instruction was challenged, the Eighth Circuit held that any arguable error was not plain error. *Id.* at 645–46. Consequently, we find no plain error in the trial court's Instruction No. 13.

## IV. *Eyewitness Testimony*

■ Appellant tendered an instruction which would caution the jury in its handling of an identification made by an eyewitness to a crime. The instruction paralleled an instruction set out in the appendix to *United States v. Telfaire,* 469 F.2d 552, 558 (D.C.Cir.1972). Appellant's instruction was rejected by the district court, and this ruling is now urged as reversible error. We do not agree.

This Circuit addressed *Telfaire* in *United States v. Cueto,* 628 F.2d 1273 (10th Cir. 1980), where we held that it was not error for a district court to refuse to give a *Telfaire* instruction when the government's case did not hang on the identification made by a single eyewitness and where there was other corroborating evidence. *Id.* at 1276. Further, in *United States v. Thoma,* 713 F.2d 604, 608 (10th Cir.1983), *cert. denied,* 464 U.S. 1047, 104 S.Ct. 721, 79 L.Ed.2d 183 (1984), we spoke as follows:

When a cautionary instruction on the possible infirmities of eyewitness testimony is requested and not given, on appeal we will focus on the facts of each case to determine whether the instruction was required to fairly present the case to the jury. In particular, we will consider whether identification was the sole or primary issue in the case, whether the evidence consisted mainly of eyewitness identification testimony, and whether that testimony was uncertain, qualified, or suggested a serious question whether the witnesses had an adequate opportunity to observe. In the instant case, the government's case did not depend upon a single eyewitness, but upon several witnesses whose identifications were not shaken despite some uncertainties and disparities in their testimony and whose testimony was partially supported by the testimony of the defendant's common-law wife.

Thus, under the facts in *Thoma*, we held that the failure to give a cautionary instruction was not reversible error.

In the instant case, Pamela Hecht, an assistant manager, identified Bobby McNeal as one of the robbers. Jockenna O'Neal, who testified that she had purchased the Colt Diamondback revolver from Terry McNeal, was shown a series of surveillance photos taken during the robbery, and at trial she identified both Terry McNeal and Bobby McNeal as the robbers. She was a long-time friend of the McNeal brothers and had on prior occasions even seen Bobby McNeal in the Afro wig like the one he was wearing during the robbery. Applying the analysis from *Cueto* and *Thoma*, we find no error in denying the *Telefaire* instruction.

### V. *Prosecutorial Misconduct*

■ As stated above, Paulette Reyes, a teller, testified at trial that Terry McNeal was the robber who came behind the teller's cage and obtained the money. Other witnesses, however, testified that Terry McNeal was the individual who assaulted the guard, and that it was Bobby McNeal in the Afro wig who collected the money. In this setting, the following colloquy between government counsel and Paulette Reyes took place:

> Government: Okay. Now the robber that you did see, you viewed a video lineup and do you recall picking someone in that lineup?
>
> Reyes: Yes.
>
> Government: But you picked the wrong person, correct?
>
> Reyes: Yes.
>
> Government: And would it surprise you if you learned that you picked the wrong person here in the courtroom today?

At which time appellant immediately objected, and the objection was sustained. Appellant then moved for a mistrial, but that motion was denied.

On appeal, the appellant argues that the comment of the government attorney constitutes prosecutorial misconduct which requires reversal. We disagree. In *United States v. Alexander*, 849 F.2d 1293, 1297 (10th Cir.1988), we stated that prosecutorial misconduct is not *per se* reversible error, and that we should first determine whether the prosecutor's conduct was improper, and, if improper, whether such requires a reversal or is harmless error. *Id.* at 1297 (citing *United States v. Hastings*, 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983)). In *Alexander* we concluded that prosecutorial error in that case, "if present, was harmless."

In the present case, by the time the government questioned Ms. Reyes, there had already been an eyewitness identification of Terry McNeal as the robber who remained in the lobby during the robbery. Additionally, Jockenna O'Neal had already testified, and the surveillance photos of the robbery had been admitted into evidence. Thus, if there was any prosecutorial misconduct in the present case, it was minuscule, and all things considered, harmless error beyond a reasonable doubt.

JUDGMENT AFFIRMED.