**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 10-4545**

———————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

JERRY BARNES,

              Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Fox, Senior District Judge. (5:09-cr-00158-F-3)

———————

Argued: January 24, 2012          Decided: May 11, 2012

———————

Before TRAXLER, Chief Judge, FLOYD, Circuit Judge, and J. Michelle CHILDS, United States District Judge for the District of South Carolina, sitting by designation.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Mary Jude Darrow, Raleigh, North Carolina, for Appellant. Felice McConnell Corpening, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** John Stuart Bruce, Acting United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In May 2009, Appellant Jerry Barnes and five co-defendants were indicted in connection with the December 12, 2008, armed robbery of a BB&T Bank branch in Elm City, North Carolina. The charges against Barnes included (1) conspiracy to commit armed bank robbery, see 18 U.S.C. § 371; (2) aiding and abetting armed bank robbery with forced accompaniment, see 18 U.S.C. § 2113(a),(d), (e); 18 U.S.C. § 2; and (3) aiding and abetting the use of a firearm during and in relation to a crime of violence, see 18 U.S.C § 924(c)(1)(A)(ii); 18 U.S.C. § 2. Barnes was convicted on all three counts following a jury trial. He raises numerous issues on appeal. We affirm.

I.

Trial testimony established that in December 2008, Brian Lucas, Anthony Atkinson, Marcus Wiley and Appellant Barnes began making plans to rob the BB&T on Main Street in Elm City. Their discussions included where they could park before the robbery and where they would go after committing the robbery. Barnes testified and denied participating in the planning, but Wiley testified that Barnes took part in the planning. Barnes admitted, however, that on the night before the robbery, this same group of people gathered at the home of George Thomas, where Barnes was residing. According to Wiley, the topics

2

discussed that evening included where to park during the robbery, the need for a get-away driver, and what role Barnes, an amputee, would play in the robbery. The group decided that Barnes would park his truck in front of the drug store located across the street from the BB&T in order to block the window and distract any potential witnesses who were inside the drug store. During the discussions, Barnes presented a map, sketched on the back of an insurance receipt, showing the bank's immediate vicinity, the location of the drug store, and the spot where Barnes was supposed to park his truck in relation to the bank and the drug store.

On December 12, 2008, the morning of the robbery, Barnes drove Wiley, Atkinson, and Lucas to the Bank to scout the general area for law enforcement personnel. After observing the area, the group spotted Matthew Farr at the Short Stop convenience store and recruited him to serve as one of the get-away drivers. Barnes then drove Wiley, Atkinson, and Lucas back to Thomas's house to meet Vernon Atkinson ("BJ"), whom Barnes had also recruited as a get-away driver.

BJ then drove Wiley, Atkinson, and Lucas to the vicinity of the bank and dropped them off, while Barnes drove his Chevrolet Suburban separately and parked it in front of the drug store across the street from the bank. The location of the Suburban prevented anyone in the drug store from seeing

3

customers entering or exiting the bank. Barnes went inside the drug store for about 15-20 minutes, drawing attention to himself by asking the pharmacist about possible medications for "phantom pain" in his missing limb. J.A. 307. After Barnes spoke with the pharmacist, he went to the front of the store and ordered two milkshakes and then bought some jewelry. Barnes left the drug store and was pulling away in his truck just as Wiley, Lucas, and Atkinson were entering the bank wearing masks. During the robbery, Barnes' co-defendants threatened bank employees and Atkinson brandished a hand gun. They fled the bank with over $20,000.00.

BJ drove them from the bank to a location where Farr was waiting in a second get-away car. Farr then drove Wiley, Lucas, and Atkinson to an area called "Sleepy Hollow" where Barnes was supposed to meet them. Lucas called Barnes to see where he was, but Barnes told Lucas that a lot of police officers had responded to the robbery and that they should "stay put."

In the meantime, Barnes had driven from the drug store to meet his cousin Rodney for their regularly scheduled Friday trip to a flea market. When Rodney got into Barnes' Suburban, Barnes was on his cell phone telling someone "to stay put." J.A. 317. Barnes then told Rodney that he had been speaking with Lucas and that Lucas and some others had just robbed a

4

bank.   Barnes then picked up BJ, who had never previously gone to the flea market with Barnes and Rodney.

On the way to the flea market, Barnes encountered a road block that had been set up because of the bank robbery. Officers asked Barnes for proof of insurance and Barnes produced the insurance receipt with the diagram that was drawn while the robbery was being planned.   Officers noticed a "crudely drawn map" on the back of the insurance receipt and were suspicious about whether the map might be connected with the robbery.   At the request of the officers, Barnes agreed to let the police keep the insurance receipt.   Barnes was then allowed to pass through the road block.   After staying a short period at the flea market, Barnes and BJ took Rodney home, then drove separately to retrieve Barnes' co-conspirators from Sleepy Hollow.   Atkinson rode with Barnes while Lucas, Wiley and BJ rode together.

Investigators later took the map to the bank and determined that although the map did not match the interior lay-out of the bank, it appeared to reflect the exterior vicinity of the bank.   Additional investigation quickly led to the arrests of Atkinsons, Wiley, Lucas, Farr, and Barnes.

The jury found Barnes guilty on all three charges.   At sentencing, the district court concluded that the evidence supported an enhancement for Barnes as a leader, supervisor, or

manager over the other co-defendants. The court ultimately sentenced Barnes to a 60-month term on Count One (conspiracy to commit bank robbery); a concurrent 135-month term on Count Two (aiding and abetting armed bank robbery with forced accompaniment); and a consecutive 84-month term on Count Three (aiding and abetting the using and carrying of a firearm during and in relation to a crime of violence), for a total sentence of 219 months.

## II.

Barnes first contends that the district court erroneously excluded extrinsic evidence of prior statements Wiley made that were inconsistent with his trial testimony implicating Barnes in the robbery.

In a videotaped post-arrest interview, Wiley confessed to his own involvement in the conspiracy but did not mention Barnes as one of his co-conspirators. During the interview, Wiley also signed a statement that did not implicate Barnes in the robbery. Also, at Barnes' request, Wiley signed a letter Barnes had prepared indicating that Barnes had no role in the crime. And, finally, Wiley prepared another statement himself indicating that Barnes was not involved in the robbery.

At trial, however, Wiley implicated Barnes in the planning and execution of the robbery. During his testimony on

6

direct examination, Wiley admitted that when he was interviewed by the police after the robbery, he "lied" and did not tell them about Barnes because "his role was so small and he just helped plan and cause a distraction." J.A. 157-58. Likewise, throughout cross-examination Wiley admitted that he did not mention Barnes in his initial statements to the police, and that in subsequent written statements he specifically denied that Barnes was involved.

The district court refused to admit Wiley's videotaped interview and his written statements as inconsistent statements under Federal Rule of Evidence 613(b). We review a district court's decision to admit or exclude evidence for an abuse of discretion. See United States v. Lighty, 616 F.3d 321, 351 (4th Cir. 2010). Rule 613(b) permits the admission of a prior statement for impeachment purposes, so long as the prior statement is inconsistent, the witness is afforded an opportunity to explain or deny the prior statement, and the opposing party is permitted to interrogate the witness about such a statement. See Fed. R. Evid. 613(b); see also United States v. Young, 248 F.3d 260, 267 (4th Cir. 2001). Even if the requirements of Rule 613(b) are otherwise satisfied, a court is not obligated to admit the extrinsic evidence if, under Rule 403, its "'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

7

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" Young, 248 F.3d at 268 (quoting Fed. R. Evid. 403).

The district court addressed this issue at a number of points throughout the trial, suggesting at times that Wiley's prior statements were not inconsistent with his trial testimony as required by Rule 613(b), and at others that the probative value of the evidence was outweighed by the unnecessary introduction of cumulative evidence under Rule 403. We need not delve too deeply into the court's reasoning, however, because any error by the court would have been harmless in any event. "Evidentiary rulings are subject to harmless error review," and we will find an error harmless if we can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010) (internal quotation marks omitted).

During cross-examination, defense counsel forced Wiley to admit numerous times to the jury that he was telling a different story at trial than he had told police, orally and in writing, soon after the robbery. Defense counsel asked Wiley at least 15 questions requiring Wiley to admit that he had either not mentioned Barnes as one of the co-conspirators in the bank

8

robbery or specifically denied that Barnes was involved. Moreover, counsel effectively pointed out through cross-examination that Wiley never went to the police to correct his prior statements that he was contending at trial were false. It is clear that Barnes was able to accomplish his purposes of undercutting Wiley's credibility even without the extrinsic evidence. See Young, 248 F.3d at 269 (holding that district court's failure to admit audiotape of a prior inconsistent statement was harmless when the witness admitted on cross-examination that the prior statement was inconsistent). Accordingly, we conclude that any error was harmless as we can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Johnson, 617 F.3d at 292.[*]

---

[*] We also conclude Barnes' related argument that Matthew Farr, one of the get-away drivers, made a prior inconsistent statement is without merit. Farr, who was not at the group meeting where the robbery was planned, told police when asked what role Barnes played that Barnes "didn't really do nothing." J.A. 239. It is unclear to us whether this statement—which Farr admitted making—is even inconsistent with Farr's trial testimony that Barnes was in the car at the Short Stop when Lucas asked Farr to help them on a job. But, even if the exclusion of this extrinsic evidence was an error, it was clearly a harmless one.

Next, Barnes challenges the district court's imposition of a four-level organizer enhancement under U.S.S.G. § 3B1.1(a). To qualify for a four-level increase under U.S.S.G. § 3B1.1(a), a defendant must have been "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Application Note 4 states several relevant factors, including the "nature of [the defendant's] participation in the commission of the offense," the "degree of participation in planning or organizing the offense," and "the nature and scope of the illegal activity." U.S.S.G. § 3B1.1, cmt. n.4. A district court's factual finding that a defendant was an organizer or leader in an offense is reviewed for clear error. See United States v. Kellam, 568 F.3d 125, 147-48 (4th Cir. 2009).

There is sufficient evidence in the record at trial and sentencing to show that the district court did not commit clear error in finding that Barnes was an organizer. The evidence showed that the primary meeting where the robbery was planned was held at the residence where Barnes was living. Barnes participated in this planning meeting and drew for the group the map of the bank and its surrounding vicinity, which was later recovered from Barnes' Suburban by police officers. Barnes gathered the other participants in his vehicle on the

10

morning of the robbery and drove them near the bank to scout the area for law enforcement and traffic conditions. Barnes drove the group to the Short Stop gas station where they recruited Farr as a get-away driver. And, in fact, Barnes had previously recruited B.J. Atkinson to drive his car during and after the robbery. Moreover, there was evidence that Barnes obtained the handgun that Atkinson used during the robbery.

Barnes argues that none of the participants had decision-making authority and that they shared equally in the planning process. Barnes is simply disputing the conclusion the court drew from the facts. Although the court could possibly have concluded otherwise, it was not clear error to conclude that Barnes was an organizer.

IV.

Next, Barnes objects to the district court's refusal to allow defense counsel to question Wiley concerning his mental health. We review a district court's determination as to the scope of cross-examination for abuse of discretion. See United States v. Scheetz, 293 F.3d 175, 184 (4th Cir. 2002). During cross-examination, the district court barred defense counsel from asking Wiley about purported statements he made to nurses while in jail that he had seen hallucinations of dead people. Barnes contends that these statements, which Wiley allegedly

11

made within a year of trial, were relevant to Wiley's credibility.

Mental defect can be a proper basis by which to attack a witness's credibility if the alleged mental defect was "at a time probatively related to the time period about which he was attempting to testify," and it "go[es] to the witness' qualification to testify and ability to recall," and does "not introduce into the case a collateral issue which would confuse the jury." United States v. Lopez, 611 F.2d 44, 46 (4th Cir. 1979) (internal quotation marks omitted); see United States v. Jimenez, 256 F.3d 330, 343 (5th Cir. 2001).

Barnes does not suggest that Wiley was experiencing hallucinations at the time of the robbery or in the days immediately preceding the robbery indicating Wiley was unable to perceive or recall the details of the robbery or its planning. Likewise, there is no evidence suggesting Wiley was experiencing hallucinations at the time of trial or that they affected his ability to recall and testify accurately at trial. By contrast, the district court allowed cross-examination of Wiley regarding his substantial drug use within a day or two of the robbery, including his use of marijuana, cigarettes soaked in embalming fluid and Ecstasy.

We conclude the evidence did not reflect that Wiley's hallucinations occurred "at a time probatively related to the

12

time period about which he was attempting to testify," Lopez, 611 F.2d at 46 (internal quotation marks omitted), and thus the district court did not abuse its discretion in excluding this evidence.

V.

Next, Barnes challenges the district court's refusal to issue an "Eyewitness Identification" instruction. We review the district court's refusal to give a defendant's requested jury instruction for abuse of discretion. See United States v. Moye, 454 F.3d 390, 397–98 (4th Cir. 2006) (en banc). "[W]e accord the District Court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law." United States v. Hassouneh, 199 F.3d 175, 181 (4th Cir. 2000).

Barnes' proposed identification charge explained that the value of identification testimony "depends on the opportunity the witness had to observe the person initially and later to make a reliable identification," and that "[a] reliable identification would not be one unfairly suggested by events that have occurred since the time of the initial observation." Barnes' asserted basis for an eyewitness identification instruction was the conflict between Farr's testimony that Barnes was with Atkinson, Wiley and Lucas at the Short Stop

13

convenience store when the group asked Farr to help with the robbery, and Barnes' testimony that he was never at the Short Stop on the day of the robbery.

We conclude that the court's refusal to issue this charge was well within the court's discretion. Misidentification was not an issue at trial. Farr testified that he had known Barnes for "a couple" of years before the robbery and that he was only 15 feet away from Barnes' Suburban during the conversation at the Short Stop that morning. More importantly, Farr's testimony was corroborated by Wiley, who testified that he and Barnes were in the vehicle with Atkinson and Lucas when they saw Farr at the Short Stop and stopped to speak with him. Accordingly, we reject this argument as well. See United States v. Jackson, 347 F.3d 598, 607 (6th Cir. 2003) ("Identification instructions are within the discretion of the trial court; they need only be given if there is a danger of misidentification due to a lack of corroborating evidence."); United States v. McNeal, 865 F.2d 1167, 1171-72 (10th Cir. 1989) (no error in refusing cautionary eyewitness identification instruction where government's evidence did not depend on a single eyewitness whose testimony was not corroborated); cf. United States v. Revels, 575 F.2d 74, 76 (4th Cir. 1978) (refusing to give special identification instruction not plain error "where other independent evidence . . . is presented to

14

the trier of fact which is corroborative of the guilt of the accused").

                              VI.

Finally, Barnes argues he should be resentenced because U.S.S.G. § 4A1.1(e) was amended shortly after he was sentenced. The district court used the 2009 version of the Sentencing Guidelines, which was in effect when Barnes was sentenced on May 12, 2010. Under that version, § 4A1.1(e) required the sentencing court to add two points to the defendant's criminal history calculation if the defendant committed his offense less than two years after release from imprisonment. Effective November 1, 2010, the Sentencing Commission eliminated this "recency" provision. See U.S.S.G. App. C, amend. 742 (2010).

Barnes was not given any "recency" points under U.S.S.G. § 4A1.1(e). Rather, the district court imposed a two-level enhancement under U.S.S.G. §4A1.1(d), which applies when "the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." U.S.S.G. § 4A1.1(d). Subsection (e) was not the basis for any of Barnes' criminal history points, and so the amendment, which is not retroactive in the first place, see

                              15

U.S.S.G. § 1B1.10(c) (2010), provides no aid to Barnes whatsoever.

VII.

Accordingly, we hereby affirm Barnes' convictions and sentence.

AFFIRMED